UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADVSR, LLC,<br>          Plaintiff,<br>v.<br>MAGISTO LTD., et al.,<br>          Defendants. | Case No. 19-cv-02670-JCS<br><br>**ORDER REGARDING MOTION TO DISMISS**<br>Re: Dkt. No. 60 |

## I. INTRODUCTION

Plaintiff Advsr, LLC alleges in this action that Defendants Magisto Ltd. and Yahal Zilka are liable for claims arising from an acquisition of Magisto after Magisto had entered a consulting contract with Advsr to secure such an acquisition. Magisto has answered Advsr's complaint, but Zilka now moves under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the two claims against him, for intentional interference with contractual relations and intentional interference with prospective economic relations, for failure to state a claim on which relief can be granted. The Court held a hearing on February 28, 2020. For the reasons discussed below, Zilka's motion is DENIED.[1]

## II. ALLEGATIONS OF THE COMPLAINT

Because a plaintiff's factual allegations are generally taken as true in resolving a motion to dismiss under Rule 12(b)(6), this section summarizes the relevant allegations of Advsr's complaint as if true. Nothing in this order should be construed as resolving any issue of fact that might be disputed at a later a stage of the case.

Magisto is an Israeli technology company and "the developer of an application for

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

automated video editing." 1st Am. Compl. ("FAC," dkts. 47-4 (sealed version), 50 (public redacted version)) ¶¶ 8, 18. Zilka was a major shareholder of Magisto and a member of its board of directors. *Id.* ¶ 5.

Advsr and Magisto entered an agreement on May 22, 2017 for Advsr to facilitate the acquisition of Magisto in return for a fee totaling 3% of the price paid in such an acquisition, among other terms. *See id.* ¶¶ 19, 22. Under the terms of the contract, Advsr was entitled to its fee if Magisto "entered into" a covered transaction during the term of the agreement or within nine months following its termination, and Magisto was prohibited from intentionally structuring or delaying a transaction to avoid that obligation. *Id.* ¶ 23. Relying in part on a provision of the contract stating that its "intent is for a transaction to be viewed contextually and equitably and not narrowly," Advsr contends that "entering into" a transaction within the covered period of time does not require signing a final binding agreement during that time. *Id.* ¶¶ 24–25 & Ex. 2 (Statement of Work, § 5).

In the months following execution of its contract with Magisto, Advsr performed substantial work to identify and court potential acquirers, including introducing Magisto to IAC, "a leading media and internet company with more than 150 brands, including Vimeo." *Id.* ¶¶ 35–39. With Advsr's assistance, Magisto and IAC entered a nondisclosure agreement in July of 2017, and continued discussions thereafter. *Id.* ¶¶ 40–41.

In November of 2017, Magisto CEO Oren Boiman informed Advsr that Magisto wished to take a different approach to pursuing an acquisition than Advsr had recommended, and Advsr responded by encouraging Magisto to follow Advsr's initial approach. *Id.* ¶ 42. On December 14, 2017, Boiman told Advsr that Magisto intended to terminate its contract, but Boiman and Advsr agreed that Advsr would continue to support a potential deal between Magisto and IAC during the nine-month tail period. *Id.* ¶ 43. Magisto provided formal thirty-day notice of termination on December 17, 2017, which, if effective, would have resulted in termination on January 14, 2018, and a conclusion of the tail period in mid-October of 2018. *Id.* ¶ 45 n.3.

Advsr continued its work supporting Magisto's discussions with IAC and Vimeo. *Id.* ¶¶ 47–51. Vimeo's CEO Anjali Sud expressed interest in acquiring Magisto on August 5, 2018,

2

and Advsr, at Magisto's request, prepared a detailed economic analysis of Magisto's potential value to IAC, which Advsr presented to IAC. *Id.* ¶¶ 52–56. Magisto and IAC entered a second nondisclosure agreement on September 4, 2018 to facilitate sharing more sensitive information and conduct due diligence in anticipation of a merger. *Id.* ¶¶ 57–60. At Magisto CEO Boiman's request, Advsr then pushed IAC to offer a potential valuation range for an acquisition. *Id.* ¶ 61.

Other Magisto personnel asked Advsr to explore other potential acquirers at the same time, but because there was not sufficient time left in the tail period of the terminated contract to enter a new transaction with a different buyer, Advsr notified Boiman that it would only work to find other buyers if Magisto extended the tail period by three months. *Id.* ¶ 62. Boiman did not respond, and Advsr did not pursue other buyers. *Id.*

In response to inquiries from Advsr, IAC provided Magisto with a favorable valuation range on September 28, 2018, "far greater than anything Magisto could have achieved using a traditional approach" rather than Advsr's approach to negotiations. *Id.* ¶ 65. Given the approaching end of the tail period, Advsr asked Magisto to confirm that Advsr would be paid if the transaction closed, and Magisto CEO Boiman responded "that there was 'no question' that Advsr would be paid if the Transaction was consummated." *Id.* ¶ 66. Later on September 28th, Boiman stated in an email to Vimeo CEO Sud that the price range offered by IAC was "definitely worthy to start getting into the details." *Id.* ¶ 69 (emphasis omitted). A deal eventually closed on May 28, 2019 within the range provided on September 28, 2018. *See id.* ¶¶ 71–73.

In October of 2018, Advsr continued to act as a point of contact between Magisto and IAC, and also prepared a presentation for Magisto's board of directors outlining Advsr's work and strategy for the acquisition. *Id.* ¶ 74. Boiman deflected Advsr's requests to present to the board, instead telling Advsr to meet with Magisto's major investor and board member Defendant Zilka, who, Boiman said, disliked Advsr and had called for Advsr's contract to be terminated in November of 2017. *Id.* ¶ 75. When Advsr's CEO met with Zilka in October of 2018, Zilka criticized Advsr's performance and stated that Magisto's board was not aware of and had not approved Advsr and Magisto's pursuit of a deal with IAC during the tail period of the contract. *Id.* ¶ 76. Zilka told Advsr that it was "probably owed something" but that Boiman would prepare

3

a recommendation to the board on how to proceed. *Id.* ¶ 77 (emphasis omitted). Zilka also said that after Advsr's contract was terminated, Magisto had pursued funding from investors, which was not consistent with its strategy of pursuing an acquisition. *Id.* Boiman thereafter became "increasingly evasive" in communications with Advsr, stating that the issue of Advsr's compensation "was a matter for Zilka, the Board, and Magisto's lawyers." *Id.* ¶ 79.

Advsr learned through discovery in this action that Boiman and Zilka continued to pursue to the transaction with IAC for seven weeks after IAC presented its valuation range on September 28, 2018 "while concealing it and Advsr's role from the Board and shareholders." *Id.* ¶ 80 (emphasis omitted). In an October 18, 2018 message to Boiman regarding negotiations with other bankers, Zilka instructed him that the "tail period should be short as possible" because Magisto was "hurt significantly by the tail period," which Advsr construes as indicating Zilka's belief that Magisto owed Advsr money for its work in the tail period. *Id.* ¶ 82. Magisto and Vimeo signed a non-solicitation agreement on October 23, 2018, but Boiman and Zilka did not notify Magisto's board of that agreement or negotiations with Vimeo at a board meeting on October 25, 2018. *Id.* ¶¶ 83–84.

According to Advsr, potential reasons for Boiman and Zilka to conceal the negotiations from the Magisto board included: (1) ongoing efforts to solicit new investment without revealing the valuation range offered by IAC; (2) aversion to revealing that Magisto had breached agreements with shareholders to notify them of interest in acquisitions; (3) desire to steer negotiations to a final form without input of "difficult questions" from other shareholders and board members; and (4) increasing Boiman and Zilka's personal profit at the expense of more recent investors by structuring the acquisition as an all-cash rather than Vimeo stock deal; and (5) "bilk[ing] Advsr out of its well-earned fee." *Id.* ¶¶ 85–90. Acknowledging Advsr's entitlement to its fee would have revealed that negotiations had been ongoing for an extended period without the board's knowledge. *Id.* ¶ 91.

Advsr's counsel sent Magisto an email on November 12, 2018 seeking assurance that Advsr would be paid its fee. *Id.* ¶ 92. That email provoked a "frantic response" by Zilka and Boiman, who knew they would need to inform the board of IAC's interest and thus "required

4

some new event or document to parade as the faux starting point for the Transaction" outside of the tail period. *Id.* ¶¶ 93–94. Boiman and Zilka flew to Los Angeles on November 14, 2018 to meet with IAC and request a letter of intent ("LOI") to share with Magisto's board. *Id.* ¶ 94. IAC proposed acquiring Magisto at the low end of the September 28, 2018 valuation range. *Id.* ¶ 95. Internal correspondence from IAC personnel at the meeting indicate that "Zilka was 'in the driver's seat' at the meeting, it was Zilka who asked for an LOI to 'share with the board to formally kick off their internal review process,' and it was Zilka who insisted that Magisto needed to hire new bankers" to replace Advsr. *Id.*

IAC sent an LOI on behalf of Vimeo the next day, again at the low end of earlier valuation range. *Id.* ¶ 96. Boiman and Zilka rushed to discuss the LOI with Deutsche Bank, which had not yet been formally engaged by Magisto, and planned a counteroffer, but only after notifying the board and shareholders. *Id.* ¶ 97. Boiman emailed the board to notify it of the LOI on Saturday, November 17, 2018, and major shareholders were notified on November 20, 2018. *Id.* ¶¶ 99–100. Advsr alleges that Magisto never signed that LOI and Boiman and Zilka never intended for it to do so, but instead always intended to make a counteroffer after presenting it to the board. *Id.* ¶ 100. According to Advsr, the sequence of events indicates that Boiman and Zilka could have obtained an LOI from Magisto at any time, but only did so as a pretext to reveal the negotiations to the board and establish a transaction date outside of the tail period after Advsr sent its demand letter. *Id.* ¶ 101.

Magisto denied Advsr's demand for its fee on November 25, 2018, asserting that the discussions during the tail period did not constitute entering into a transaction covered by the parties' agreement. *Id.* ¶ 102. Advsr alleges that the short denial letter misrepresented the nature of Magisto's discussions with IAC. *Id.* ¶ 103.

Magisto continued to negotiate with Vimeo and IAC, eventually reaching a price for an all-cash asset purchase near the middle of the September 28, 2018 valuation range, or perhaps higher if other benefits to Magisto and its key employees are taken into account. *Id.* ¶¶ 108–116. Magisto and Vimeo executed the agreement on April 11, 2019, "which was consummated on or about May 28, 2019." *Id.* ¶ 115. Advsr alleges that during the late stages of negotiations, Zilka

5

and Boiman continued to take steps to conceal the early negotiations involving Advsr, including Zilka advising Boiman not to include the date of the September 4, 2018 nondisclosure agreement in a revised letter of intent, *id.* ¶ 108, and Zilka instructing Boiman and others in a conversation regarding tax liability for the acquisition to "[p]lease delete ALL correspondence on this matter ASAP," *id.* ¶ 113.

Advsr asserts the following claims, not at issue in the present motion, against Magisto: (1) breach of express contract; (2) breach of implied contract; (3) breach of the implied covenant of good faith and fair dealing; (4) fraud; (5) quantum meruit; (6) promissory estoppel; and (7) unjust enrichment. *Id.* ¶¶ 122–85.

Advsr's two claims against Zilka are for intentional interference with contractual relations and intentional interference with prospective economic relations. *Id.* ¶¶ 186–200. Both depend on allegations that "Zilka acted intentionally and without Board approval" to induce a breach or disrupt relations by:

> (a) improperly refusing to present Advsr's Board Presentation to the Board in October 2018; (b) falsely implying to Advsr in October 2018 that it would be paid for its services if the Transaction closed; (c) instructing Boiman not to pay Advsr its fee; (d) hiding the Transaction and Advsr's involvement from the Board and Magisto's shareholders for personal gain; (e) *ultra vires* leading negotiations with other bankers to further conceal the Transaction from the Board and usurp its authority; (f) requesting the sham November 15th LOI to further hide the Transaction and Advsr's involvement; (g) negotiating and obtaining a lesser purchase price from Vimeo than Magisto would have received had Zilka not engaged in the foregoing activities; and (h) deliberately deleting documents – and inducing other Board members to delete documents – relevant to Advsr's efforts to recover its fee.

*Id.* ¶¶ 189, 196. Advsr alleges that but for Zilka's conduct, Magisto would have paid Advsr its fee for the Vimeo acquisition. *Id.* ¶¶ 191–92, 199–200.

### III. ANALYSIS

#### A. Legal Standard

A complaint may be dismissed for failure to state a claim on which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp.*

*Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). Generally, a claimant's burden at the pleading stage is relatively light. Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).

In ruling on a motion to dismiss under Rule 12(b)(6), the court takes "all allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A pleading must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Rather, the claim must be "'plausible on its face,'" meaning that the claimant must plead sufficient factual allegations to "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570).

A motion to dismiss may be granted based on an affirmative defense where "the defense raises no disputed issues of fact." *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984). "Whether a particular ground for opposing a claim may be the basis for dismissal for failure to state a claim depends on whether the allegations in the complaint suffice to establish that ground, not on the nature of the ground in the abstract." *Jones v. Bock*, 549 U.S. 199, 215 (2007).

### B. Elements and Causation

The parties agree for the purpose of the present motion that California law governs Advsr's

claims against Zilka. "To prevail on a cause of action for intentional interference with contractual relations, a plaintiff must plead and prove (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148 (2004).

The elements of a claim for interference with prospective relations are similar. "In order to prove a claim for intentional interference with prospective economic advantage, a plaintiff has the burden of proving five elements: (1) an economic relationship between plaintiff and a third party, with the probability of future economic benefit to the plaintiff; (2) defendant's knowledge of the relationship; (3) an intentional act by the defendant, designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's wrongful act, including an intentional act by the defendant that is designed to disrupt the relationship between the plaintiff and a third party." *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 944 (2008).

Zilka argues that "most of Advsr's allegations" against him do not satisfy the element of causation for either claim. Mot. (dkt. 60) at 2–3; *see* Reply (dkt. 70) at 2–6. Specifically, of the allegations included in the paragraphs of Advsr's complaint summarizing Zilka's purportedly culpable conduct, Zilka contends that only item (c)—"instructing Boiman not to pay Advsr its fee," *see* FAC ¶¶ 189, 196—bears any causal relationship to Advsr's damages. He argues that the remaining allegations—refusing to allow Advsr to present to the board, implying to Advsr that it would be paid, concealing the negotiations and Advsr's involvement from the board, leading negotiations with other bankers "*ultra vires*," "requesting the sham November 15th LOI," negotiating a lesser purchase price than Magisto would have obtained with Advsr, and deleting documents, *see id.*—are not related to Advsr's harm or are "purely internal governance issue[s]." *See* Mot. at 3.

Zilka does not dispute that his alleged instruction not to pay Advsr its fee satisfies the element of causation, instead arguing only that it is protected by the "manager's privilege." *See*

8

*id.* at 3. As discussed below, the Court concludes that the manager's privilege does not warrant dismissal of this case based on Advsr's pleadings alone. The Court therefore assumes for this motion and for the sake of argument that Zilka is correct as to the lack of causal relationship between Advsr's other allegations and its harm, because in the absence of the manager's privilege, the allegation that Zilka cause Magisto to withhold Advsr's fee is sufficient to meet the element of causation and deny Zilka's motion.

### C. Scope of the Manager's Privilege

As a defense to claims of intentional interference with contract, California recognizes a "manager's privilege," under which "'a manager or agent may, with impersonal or disinterested motive, properly endeavor to protect the interests of his principal by counseling the breach of a contract with a third party which he reasonably believes to be harmful to his employer's best interests.'" *Huynh v. Vu*, 111 Cal. App. 4th 1183, 1195 (2003) (quoting *Olivet v. Frischling*, 104 Cal. App. 3d 831, 840–41 (1980), *disapproved on other grounds by Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510 (1994)). The scope of this privilege "is neither clear nor consistent," and can take "'three formulations . . . : (1) absolute, (2) mixed motive, and (3) predominant motive.'" *Id.* (quoting *Halvorsen v. Aramark Unif. Servs., Inc.*, 65 Cal. App. 4th 1383, 1391 (1998)).

In *Olivet*, a seminal California case considering this doctrine, the Court of Appeal held that the privilege did not apply where a plaintiff alleged facts supporting an inference "that defendants were acting solely in order to obtain [advantage] for themselves," but noted that at a later stage of the case the "defendants may be able to justify their conduct by showing as a matter of fact that their actions were intended solely for the benefit" of the hospital for which they served as directors. *Olivet*, 104 Cal. App. 3d at 841. That case shed little light on the grey area where a director might be motivated in part by the director's own interest and in part by the corporation's interest.

Two years after *Olivet*, the Ninth Circuit considered the issue in *Los Angeles Airways, Inc. v. Davis*, noting that "neither *Olivet* nor any other reported California decision has explicitly addressed the situation in which an advisor is alleged to have acted with a 'mixed motive,' i.e.,

9

with the intent to benefit his employer's interest as well as his own." *L.A. Airways*, 687 F.2d 321, 328 (9th Cir. 1982). With no guidance from the California courts, the Ninth Circuit adopted the "mixed motive" test, holding that so long as an advisor is motivated at least in part by the interests of a principal, the privilege applies. *Id.* The full extent of the Ninth Circuit's reasoning reads as follows:

> We conclude that where, as here, an advisor is motivated in part by a desire to benefit his principal, his conduct in inducing a breach of contract should be privileged. The privilege is designed to further certain societal interests by fostering uninhibited advice by agents to their principals. The goal of the privilege is promoted by protecting advice that is motivated, even in part, by a good faith intent to benefit the principal's interest.
>
> We believe that advice by an agent to a principal is rarely, if ever, motivated purely by a desire to benefit only the principal. An agent naturally hopes that by providing beneficial advice to his principal, the agent will benefit indirectly by gaining the further trust and confidence of his principal. If the protection of the privilege were denied every time that an advisor acted with such mixed motive, the privilege would be greatly diminished and the societal interests it was designed to promote would be frustrated. We do not believe that the California Supreme Court would so eviscerate the privilege, and we decline to do so.

*Id.*

Two decades later, a California appellate court conducted a detailed survey of the doctrine, and expressly declined to follow *L.A. Airways*. *See Huynh*, 111 Cal. App. 4th at 1196–200. The *Hyunh* court noted that cases considering a manager's decision to fire an employee had often (although not exclusively) applied an absolute immunity regardless of motive, but "outside the at-will employment arena the privilege is most often applied as a qualified one." *Id.* at 1196–98. In contexts other than employment, the court found "no consensus regarding whether this qualified manager's privilege requires that the manager's motive to benefit the principal *predominate* over any personal motive (the predominant motive test), or merely require a showing that the manager is motivated in part, if not primarily, by a desire to benefit the principal (the mixed motive test)." *Id.* at 1198. The court adopted the former test, holding that where "a manager stood to reap a tangible personal benefit from the principal's breach of contract, so that it is at least reasonably possible that the manager acted out of self-interest rather than in the interest of the principal, the

10

manager should not enjoy the protection of the manager's privilege unless the trier of fact concludes that the manager's *predominant* motive was to benefit the principal," and providing the following thorough reasoning:

> Our conclusion that the predominant motive test should be applied when a defense of manager's privilege is asserted in response to most forms of commercial tort claims rests on several factors. First, in practical terms, adopting the mixed motive test would be tantamount to proclaiming absolute immunity. Rare indeed would be the case where the principal's interest could not be advanced at least to some degree by the manager's advice. If not, how else would the principal become convinced to breach its contract in the first place? Despite the weight of evidence which may exist as to the real motive and interest of the manager, if the manager can enjoy immunity from tort liability merely by proffering some plausible reason the principal might benefit from a breach, few cases will ever reach a civil jury, let alone result in a verdict against the manager.
>
> Second, the predominant motive test also best meets the economic considerations applicable to the tort of interference with contract. Generally, the right of a contracting party to breach a contract and pay damages (nominally referred to as "expectation damages"), instead of being required by law to perform, has driven legal economists to extol the principle of efficient breach of contract as " '[o]ne of the most enlightening insights of law and economics.' " (McChesney, *Tortious Interference with Contract Versus "Efficient" Breach: Theory and Empirical Evidence* (1999) 28 J. Legal Stud. 131, 132, fn. omitted, quoting Cooter & Ulen, Law and Economics (1988), p. 290.) Essentially, where it is worth more to the promisor to breach rather than to perform a contract, it is more efficient for the law to allow the promisor to breach the contract and to pay the promisee damages based on the benefit the promisee expected to gain by the completed contract. (*Ibid.*) Providing a manager with immunity where the advice to breach is given predominantly to benefit the principal is consistent with the efficient breach theory: The principal/promisor is thus enabled to obtain and rely on the manager's advice in making a judgment whether its interests are best served by performance, or by breach and the payment of damages to the promisee.
>
> However, if the manager's privilege is absolute, or subject only to the mixed motive test, the privilege would allow the manager to retain the manager's own benefit from the principal's breach while escaping any allocated share of liability. Where the economic benefit to the manager occasioned by the principal's breach of contract exceeds any incremental benefit to the principal, then the privilege would permit the manager to shift the manager's own burden in having caused the promisee's damages improperly to the principal. In addition, if the principal is unable to pay expectation damages to the promisee (for example, if the principal becomes bankrupt), then the inefficiency of the principal's breach is compounded by the shortfall in damages recoverable by the promisee who would be precluded from recovering an aliquot share against the manager.

> This example reveals an unnecessary inequity created by not applying the predominant motive test to the manager's privilege under a fundamental economic theory of law. It is also not simply a hypothetical illustration. (See Comment, *Boxing Basinger: Oral Contracts and the Manager's Privilege on the Ropes in Hollywood* (2002) 9 UCLA Ent. L. Rev. 285, 287–291; Note, *Main Line v. Basinger and the Mixed Motive Manager: Reexamining the Agent's Privilege to Induce Breach of Contract* (1995) 46 Hastings L.J. 609, 626.)
>
> The final factor in our decision to adopt a predominant motive test, while not compelling, is that this result is in accord with decisions of the highest courts of several other states. (See, e.g., *Geolar, Inc. v. Gilbert/Commonwealth* (Alaska 1994) 874 P.2d 937, 940–941; *Jones v. Lake Park Care Center, Inc.* (Iowa 1997) 569 N.W.2d 369, 376–378; *Nordling v. Northern States Power Co.* (Minn. 1991) 478 N.W.2d 498, 507; *Trau-Med of America, Inc. v. Allstate Ins. Co.* (Tenn. 2002) 71 S.W.3d 691, 701–702 & fn. 5; see also Note, *supra,* 46 Hastings L.J. at pp. 629, 632–637; but see *Welch v. Bancorp Management Advisors, Inc.* (1983) 296 Or. 208, 675 P.2d 172, 178–179, mod. on other grounds, 296 Or. 713, 679 P.2d 866 [adopting mixed motive test].)

*Id.* at 1198–100.

The parties here dispute whether this Court should follow the Ninth Circuit's decision in *L.A. Airways* or the California appellate court's more recent decision in *Huynh*. Zilka cites several district court decisions for the rule that this Court must follow Ninth Circuit precedent interpreting California law even if California appellate courts have reached different conclusions since the Ninth Circuit opined on the issue. *See* Reply at 10 & n.47 (*Citizens of Humanity, LLC v. LAB sarl*, No. CV 12-10627-MMM (JEMx), 2013 WL 12129393, at *17 (C.D. Cal. Apr. 22, 2013)[2]; *Simpson v. Philip Morris Inc.*, No. CV03-4717SVW(CWX), 2003 WL 23341207, at *8 (C.D. Cal. Nov. 6, 2003); *Brewster v. Cty. of Shasta*, 112 F. Supp. 2d 1185, 1188 n.5 (E.D. Cal. 2000)). This Court is aware of no binding authority so holding.

To the contrary, the Ninth Circuit has held that its interpretation of state law is "only

---

[2] Advsr makes much of the fact that the district court's decision in *Citizens of Humanity* dismissing claims based on the manager's privilege is "unpublished." *See* Opp'n (dkt. 66) at 5–6. The distinction between published and unpublished cases is highly relevant for the decisions of many appellate courts, where a published case constitutes binding precedent while an unpublished decision might range from nonprecedential to non-citable. In the context of district court decisions, however, the distinction is generally meaningless, and often depends on classifications made by a reporting service rather than by the court itself. Excepting narrow doctrines of estoppel and law of the case, no district court decision binds any court (or even the issuing court) in future cases, and all are valuable to future decisions only to the extent that their reasoning might be persuasive, without regard for whether they are "published."

binding in the absence of any subsequent indication from the California courts that [the Ninth Circuit's] interpretation was incorrect," and that intervening "decisions from the courts of appeal [can] cast a new light on the question," thus reaffirming—even where the Ninth Circuit has previously addressed an issue of state law—the rule that "'[i]n the absence of a pronouncement by the highest court of a state, the federal courts must follow the decision of the intermediate appellate courts of the state unless there is convincing evidence that the highest court of the state would decide differently.'" *Owen ex rel. Owen v. United States*, 713 F.2d 1461, 1464 (9th Cir. 1983) (quoting *Andrade v. City of Phoenix*, 692 F.2d 557, 559 (9th Cir. 1982) (per curiam)). More recently, the Ninth Circuit has held that it was "bound to follow" two intermediate California appellate decisions that conflicted with a previous Ninth Circuit interpretation of California law "absent convincing evidence that the California Supreme Court would reject" the California appellate courts' approach. *In re Watts*, 298 F.3d 1077, 1082 (9th Cir. 2002). In light of *Watts* and *Owen*, this Court has previously recognized that it is not bound by Ninth Circuit interpretations of state law that have since been contradicted by state appellate courts. *Watkins v. City of Oakland*, No. 17-cv-06002-JCS, 2018 WL 574906, at *12 (N.D. Cal. Jan. 26, 2018); *see also In re Seagate Tech. LLC*, 326 F.R.D. 223, 240 (N.D. Cal. 2018). The Court respectfully disagrees with district courts that have reached the opposite conclusion, including *Citizens of Humanity*, 2013 WL 12129393, at *17, *Simpson*, 2003 WL 23341207, at *8, and *Brewster*, 112 F. Supp. 2d at 1188 n.5.

In *L.A. Airways*, the Ninth Circuit acted without the benefit of any published California decision on point, and provided relatively limited reasoning to support its conclusion that a mixed motive test should apply. *See L.A. Airways*, 687 F.2d at 328. The court justified its conclusion that even a small degree of personal motivation should not *always* destroy the privilege, but does not appear to have considered whether a "predominant motive" test would be preferable. *See id.* In the more recent *Huynh* decision, the California court considered that issue, noted that a strict application of the *L.A. Airways* "mixed motive" test would render the privilege virtually absolute, and presented reasons why allowing a manager largely motivated by self-interest to escape liability based on the privilege would create incentives contrary to public policy. *See Huynh*, 111

13

Cal. App. 4th at 1198–99. This Court discerns no "convincing evidence" in the reasoning of *L.A. Airways* or any other authority cited by Defendants indicating that the California Supreme Court would reject *Huynh*'s conclusion if presented with the issue. *See Watts*, 298 F.3d at 1082; *Owen*, 713 F.2d at 1464.

Zilka argues that federal courts have "steadfastly rejected *Huyn* [sic]," Mot. at 6–7, citing one district court decision that did not address *Huynh* at all (*Chaganti v. I2 Phone Int'l, Inc.*, 635 F. Supp. 2d 1065, 1075 (N.D. Cal. 2007)), one that acknowledged *Huynh* but did not explain why it followed the *L.A. Airways* rule instead (*Harrison Ventures, LLC v. Alta Mira Treatment Ctr., LLC*, No. C 10-00188 RS, 2010 WL 1929566, at *6 (N.D. Cal. May 12, 2010)), and one that appears to have considered itself bound by *L.A. Airways* despite the intervening and conflicting decision in *Huynh* (*Salandstacy Corp. v. Freeney*, No. CV 12-10106 SJO (Ex), 2014 WL 12570924, at *5 (C.D. Cal. Jan. 3, 2014)). In his reply brief, Zilka notes that another decisions from this district applied *L.A. Airways*'s "mixed motive" rule despite also citing *Huynh*, *see* Reply at 11, but that case does not appear to have recognized any meaningful distinction between *Huynh* and *L.A. Airways*, despite *Huynh*'s explicit characterization of *L.A. Airways* as adopting the "mixed motive" test that *Huynh* rejects. *See Canard v. Bricker*, No. 14-cv-04986-JSC, 2015 WL 846997, at *3 (N.D. Cal. Feb. 25, 2015); *cf. Huynh*, 111 Cal App. 4th at 1196, 1198.

This Court respectfully disagrees with those decisions, which do not appear to have considered Ninth Circuit precedent addressing the effect of intervening state appellate decisions on the precedential value of earlier Ninth Circuit interpretations of state law. This Court therefore follows *Huynh* and applies the "predominant motive" test to the case at hand.

Zilka's briefs do not argue that Advsr's allegations fail that test, arguing only that Advsr's allegations show that he "acted, *at least in part*, to benefit Magisto," Reply at 13, and that "whether [he] sought to benefit himself from the Transaction is beside the point here," Mot. at 7. *See generally* Mot. at 6–8; Reply at 10–13. At the hearing, Zilka's counsel argued for the first time that he should prevail even under the *Huynh* standard. Zilka is correct that some of Advsr's allegations indicate that he was motivated to save Magisto money. *See, e.g.*, FAC ¶ 90 (identifying a desire to "avoid their obligation to pay and thereby save Magisto [a large sum of

14

money]" as a "fourth reason" for Zilka and Boiman's conduct). Advsr also alleges, however, that Zilka and Boiman were motivated by a separate and purely personal desire to control the deal themselves so that they could structure it to benefit early Magisto investors (like themselves) at the expense of more recent Magisto investors, FAC ¶¶ 88–89, and that paying Advsr for its work would have revealed to the rest of Magisto's board and investors that Zilka and Boiman had negotiated an acquisition in secret over an extended period of time, *see id.* ¶¶ 5, 85–87, 91. Based on these allegations, the Court cannot say that Advsr's complaint reveals, as a matter of undisputed fact, that Zilka was "predominantly" motivated by Magisto's interests. The motion to dismiss is therefore DENIED.

## IV. CONCLUSION

For the reasons discussed above, Zilka's motion to dismiss the claims against him in Advsr's first amended complaint is DENIED.

**IT IS SO ORDERED.**

Dated: February 28, 2020

JOSEPH C. SPERO
Chief Magistrate Judge

15