1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ADVSR, LLC,

           Plaintiff,

     v.

MAGISTO LTD., et al.,

           Defendants.

Case No.  19-cv-02670-JCS

**ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 110, 111

## I.      INTRODUCTION

Plaintiff Advsr, LLC asserts, among other related theories, that Defendant Magisto Ltd. breached a contract to pay Advsr a commission for work securing Magisto's acquisition by another company, and Defendant Yahal Zilka induced Magisto to do so.  Defendants have each filed a motion for summary judgment on all claims against them.  The Court held a hearing on July 30, 2021.  For the reasons discussed below, Zilka's motion is GRANTED as to both claims against him, and Magisto's motion is GRANTED in part and DENIED in part.  All of Advsr's claims against Magisto may proceed, but some are limited to certain conduct as addressed in more detail below, generally occurring near or after the conclusion of a tail period of the parties' contract in the fall of 2018.[1]

## II.     BACKGROUND

### A.      Factual Overview

This summary of the factual background of the case is intended as context for the analysis below, and not as a complete recitation of the evidentiary record.  In light of the procedural

---

[1] The parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c)

context of these motions, the facts are generally presented in a light favorable to Advsr. This background section should not be construed as resolving any issue of fact that might be disputed.

### 1. Key Players

Defendant Magisto was a software startup focused on video content creation technology, cofounded by Oren Boiman. One of its major investors was the Magma venture capital firm, whose managing partner Defendant Yahal Zilka was a member of Magisto's board of directors. Plaintiff Advsr is a firm that advises companies seeking to be acquired on mergers and acquisitions, headed by Ezra Roizen and focused around a framework for negotiations called the "Magic Box Paradigm," which involves emphasizing the added value of synergy between the acquiror and acquiree and avoiding intermediate concrete steps before a final deal is reached, a strategy Roizen believes maximizes the eventual purchase price. *See* Roizen Decl. (dkt. 120-1) ¶¶ 1–2, 5.

IAC, which eventually purchased Magisto's assets, is a media holding company that owned, among other companies, Vimeo, an internet video publishing service.[2] Anjali Sud is Vimeo's chief executive officer.

### 2. Magisto's Retention of Advsr

On April 28, 2017, Advsr's general manager Roizen emailed Boiman a proposed master services agreement (the "MSA"), statement of work for consulting services, and statement of work for pursuing a transaction (the "Transaction SOW"). Boiman Decl. (dkt. 110-1) Exs. 1, 26; Roizen Decl. ¶ 6. The draft Transaction SOW called for Advsr to receive a four-percent commission "[i]n the event any Covered Transaction (as defined herein) is entered into during the term of this SOW or within the 12 month period following termination of this SOW (the 'Tail Period')." Boiman Decl. Ex. 3. Boiman forwarded that email to Defendant Yahal Zilka—a managing partner of the Magma venture capital firm, and a director of and major investor in Magisto—and others stating that Advsr's proposed four-percent commission was high, but that

---

[2] While the Court has endeavored to track in this order distinctions in the evidence between Vimeo and IAC, such distinctions are not relevant to the outcome of the present motions, and those two entities are generally interchangeable for the purpose of this case.

United States District Court
Northern District of California

Advsr was well connected and appeared to be Magisto's best option.  Boiman Decl. Ex. 1.

Boiman liked that Advsr appeared to be more engaged than other potential investment bankers and

came with a recommendation from someone he trusted.  Daniel Decl. (dkt. 110-3) Ex. 2 (Boiman

Dep.) at 46:1–7.

On May 12, 2017, after Roizen met with Zilka, Boiman responded to Roizen and requested

changes to some of the terms, specifically a three percent rather than four percent commission, a

monthly rather than quarterly retainer, and the following concerns about the tail period:

> * The tail definition includes every kind of transaction with any company for a long period.
>
> Obviously, if we end up working together, we hope and expect you'd be able to deliver an effective process with us dedicating all required resources to make it effective.
>
> However from a legal perspective, we need to take into account a worst case scenario that "you don't deliver" and the agreement will be terminated.
>
> In that case, we might need to take another investment banker and we can't accrue the banker compensation in that case.
>
> We can make the tail shorter (6 months) and general, or longer but more specific (e.g., for company discussions that materializes beyond some threshold).

Boiman Decl. Ex. 26.  Roizen's complete response reads as follows:

> Hey Oren –
>
> We can do monthly billing – not our preference, but in this case not worth fighting over.
>
> We can meet you in the middle and do a 9 month tail.
>
> Let me know if this works for you.
>
> Ezra.

*Id.*

According to Roizen, he and Boiman discussed the nature of the tail period and reasons for

keepings its scope broad and the bar low for meeting it—particularly, ensuring that Advsr would

be incentivized by having "more ways in which [it] could earn its fee"—at length during telephone

calls.  Roizen Decl. ¶¶ 11–14.

United States District Court
Northern District of California

Boiman responded by email that Magisto would "like to move forward," and asked Roizen to send him the documents "in a Word or editable format[], preferably with the additions above as tracked changes so that we can finalize." Boiman Decl. Ex. 26. Roizen sent Boiman revised documents with a three-percent commission and a nine-month tail period, among other changes not at issue here. Boiman Decl. Ex. 4. On May 19, 2017, Boiman asked Zilka if he would prefer to use a different banker, and Zilka responded that he would defer to Boiman's decision. Zilka Decl. (dkt. 110-2) Ex. 7. Zilka testified that his usual practice was to make recommendations to entrepreneurs with whom he had invested but ultimately defer to their decisions to manage their companies. Daniel Decl. Ex. 1 (Zilka Dep.) at 78:11–24.

Based on Boiman's recommendation, the Magisto board decided to engage Advsr. Daniel Decl. Ex. 1 (Zilka Dep.) at 73:3–24. The Transaction SOW executed by the parties, with an effective date of May 22, 2017, includes the following relevant provisions:

### 2. Description of Compensation

In the event any Covered Transaction (as defined herein) is entered into during the term of this SOW or within the 9 month period following termination of this SOW (the "Tail Period"), the Company [i.e., Magisto] shall pay to Advsr in cash at the closing of such Transaction a transaction fee (the "Covered Transaction Fee") that is equal to 3.0% of the Transaction Value (as defined herein).

Payment of a Covered Transaction Fee shall be a condition of closing of any Covered Transaction. Advsr agrees that the Covered Transaction Fee is contingent on the closing of a Covered Transaction and the Company will not be obligated to pay a Covered Transaction Fee unless a Covered Transaction is consummated. The Company agrees it shall not intentionally structure or delay any transaction for the purpose of circumventing the definition of "Covered Transaction" or the obligation to pay any Covered Transaction Fee. Any adjustments to Covered Transaction Fees must be agreed by the Company and Advsr in writing by amending or replacing this SOW.

This SOW does not and will not constitute any commitment, express or implied, on the part of Advsr to ensure the successful arrangement or completion of a Covered Transaction.

### 3. Term and Termination

This SOW shall remain in effect until either terminated or replaced by a new SOW. This SOW may be terminated by either Advsr or Company for any reason giving 30 days prior written notice of termination to the other. If replaced, a new SOW clearly stating that it is replacing this SOW and executed by both Advsr and Company

shall serve as its replacement. The Company's obligation in Sections 2 and 5 to pay Advsr the Covered Transaction Fee shall survive the termination of this SOW. Termination of this SOW shall not be deemed to terminate the MSA. Termination of the MSA must be in accordance with the Termination provision of the MSA.

[. . .]

**5. Terms Defined in SOW**

"Covered Transaction" means any change of control transaction or extraordinary transaction involving the Company that may occur, including by way of any of the following in a single transaction or series of related transactions:

(i) the sale to or acquisition by one or more persons of at least a majority of the outstanding voting membership interests, partnership interests or stock of the Company;

(ii) the sale or transfer of at least a majority of the assets of the Company to one or more persons (including by way of the settlement of claims);

[other similar examples of transactions transferring control or meaningful assets of Magisto.]

The definition of a Covered Transaction shall be interpreted as follows:

(i) In a manner that recognizes that it is difficult to categorize every possible transaction that will effectively constitute a change of control of the Company or other extraordinary transactions and that the intent is for a transaction to be viewed contextually and equitably and not narrowly.

(ii) As applicable, the Company shall include subsidiaries of the Company.

(iii) In no event shall a Covered Transaction result merely from a merger or consolidation of the Company with a wholly-owned subsidiary of the Company, or a reincorporation of the Company in a different jurisdiction.

Boiman Decl. Ex. 5.  All told, the parties went through five versions of the agreement before reaching that final document.  Roizen Decl. ¶ 8 & Exs. 2, 6–9 109–14.  Zilka testified that he had no role in negotiating the SOWs.  Daniel Decl. Ex. 1 (Zilka Dep.) at 86:7–10.

At his deposition, Roizen testified that he understand the Transaction SOW's trigger for payment during the tail period as based on an "entry point" towards a transaction, which would include "[m]eaningful M&A discussions," "a meaningful deep dive," "the forming of a thesis and . . . a statement that acquisition was the reason for the conversation," at least some forms of

5

United States District Court
Northern District of California

1    negotiations, or the "exchange of information that you wouldn't exchange outside of the ordinary

2    course of business," and that he believed based on his conversations with Boiman that Boiman

3    shared that understanding.  Daniel Decl. Ex. 3 (Roizen Dep.) at 54:16–55:2, 73:2–4; Lorin Decl.

4    (dkt. 121) Ex. 5 (Roizen Dep.) at 326:17–20.

5        Advsr's expert witness Michael LeRoy—a former consultant and executive experienced in

6    mergers and acquisitions—states in his report that, as the term is commonly used, "an M&A

7    'transaction' refers to a lengthy, complicated, iterative process that involves numerous steps and

8    multiple stages," and "people speak of a transaction as existing well before it is closed or

9    consummated and, indeed, even if it never consummates."  Lorin Decl. Ex. 12 (LeRoy Report)

10   ¶¶ 380–84.  LeRoy states that "[i]n the context of M&A transactions, the term 'entered into' is a

11   frequently used term which is used to describe a point in the transaction long before closing or

12   consummation," and describes the stage "after there has been a point of entry into the transaction

13   by which point the transaction has already begun and become extant."  *Id.* ¶ 391.  In his view, that

14   test is met "by the time the parties are engaged in due diligence, have executed an NDA, have in-

15   person senior management discussions, and have price discussions," or in other words, "the

16   discussions must have a certain level of seriousness, which is another way of saying the parties

17   must be sufficiently engaged so as to want to continue the M&A conversations more deeply with

18   the ultimate goal of completing the transaction."  *Id.* ¶¶ 392–93.

19       Boiman testified that for an agreement to "happen" such that Advsr would be entitled to its

20   fee, he "would expect to have an agreement, to begin with, on at least the key terms of the

21   agreement to be agreed upon," which "[u]sually" would be "formalized in at least a term sheet that

22   is agreed upon and signed on both sides."  Lorin Decl. Ex. 1 (Boiman Dep.) at 111:3–112:5.

### 3.    2017–2018: Early Contact with IAC and Termination of Advsr's Contract

25       After being retained by Magisto, Advsr reached out to more than eighty potential acquirors

26   and advised Magisto on strategy and marketing.  Roizen Decl. ¶¶ 24–25.  In June and July, Roizen

27   reached out to IAC—with which he had a previous relationship—to see if IAC would be interested

28   in Magisto.  Roizen Decl. ¶¶ 26–27 & Ex. 18.  Magisto and IAC entered a nondisclosure

agreement on July 12, 2017.  Roizen Decl. ¶ 29 & Ex. 19.  On August 27, 2017, Magisto personnel met with Vimeo and IAC personnel.  Boiman Decl. ¶ 7 & Ex. 6.  Advsr facilitated continued discussions between IAC and Magisto in October and November of 2017, including the exchange of sensitive information, which Roizen understood as signaling that the parties were interested in a potential acquisition.  Roizen Decl. ¶¶ 32–35.

Zilka was dissatisfied with Advsr's work, testifying that in 2017 Advsr had produced no results and had demoralized the company by telling Boiman it was worth less than ten million dollars, which was a small fraction of the price it later sold for.  Daniel Decl. Ex. 1 (Zilka Dep.) at 89:16–90:7.  Zilka believed Roizen "didn't understand the business" and "[d]idn't have his finger on the pulse."  Daniel Decl. Ex. 1 (Zilka Dep.) at 95:21–23.  Boiman told Roizen in November of 2017 that Magisto was running low on funds and becoming impatient with the search for an acquiror, and would prefer a more structured process than Roizen recommended as part of his "Magic Box Paradigm."  Roizen Decl. ¶ 39.  At Boiman's request, Roizen prepared a presentation to Magisto's board outlining a more structured approach, but he cautioned the board that he believed the market for Magisto's product was in its infancy and pushing too hard for fast sale could result in a low acquisition price on the order of ten to twenty million dollars.  Roizen Decl. ¶¶ 40–41.

In December of 2017, Magisto's board discussed terminating Advsr's contract because Magisto's business was going well while the search for a buyer was not, and ultimately decided to do so.  Daniel Decl. Ex. 1 (Zilka Dep.) at 93:17–95:25.  Zilka expressed his belief at that meeting that Advsr added no value and "created havoc" within Magisto.  Daniel Decl. Ex. 1 (Zilka Dep.) at 97:17–98:8.  Roizen was not aware of Zilka's views at the time.  Roizen Decl. ¶ 42.

Boiman notified Roizen by telephone on December 14, 2017 that Magisto wished to terminate its contract with Advsr, based on lack of interest in an acquisition and Magisto's intent to instead raise money and build its business.  Roizen Decl. ¶¶ 43–46.  According to Roizen:

> Mr. Boiman stated as he wanted to Advsr to work on the deal during the tail and I asked for confirmation that if Advsr did so it would be paid a 3% fee in the event a transaction closed with IAC/Vimeo. Mr. Boiman confirmed.

Roizen Decl. ¶ 47.

On December 15, 2017, Roizen emailed Boiman to confirm the intent to terminate the SOWs.  Boiman Decl. Ex. 8.  In the interest of simplicity, Roizen proposed termination effective December 31, 2017, such that the tail period would begin to run on January 1, 2018.  *Id.*[3]  Boiman responded the same day as follows:

> Hi Ezra,
> As we discussed, we'd like to terminate both SOWs at this time.
> I'm fine with keeping the MSA for potential future engagements and SOWs the companies might have.
>
> As we discussed we're interested in pursuing opportunities as they come and at least for the tail period, both parties interests are aligned.
>
> It was great to work with you and your team, we learned a great deal from this experience, I hope opportunities will push us working together sooner than later.
> I'm still interested about Elevate [an Advsr program not at issue here], and need to think if and how it combines with our efforts.
>
> Best
> Oren

*Id.*

In late 2017, IAC emailed Magisto to say IAC remained interested in learning more about Magisto but would prefer to defer discussions to the next year unless there was any urgency on Magisto's part, which Boiman understand as politely expressing that IAC was not in fact interested in moving forward with Magisto.  Daniel Decl. Ex. 2 (Boiman Dep.) at 219:13–220:19.  Boiman was correct that IAC was not initially interested in acquiring Magisto.  Daniel Decl. Ex. 4 (Sud Dep.) at 43:6–19.  Advsr nevertheless continued facilitating discussions between IAC and Magisto, including an in-person meeting in New York in January of 2018, at which IAC and Magisto discussed a potential business development partnership, and discussions regarding technology integration continued into May of 2018.  Roizen Decl. ¶¶ 36, 55–60.

---

[3] According to Roizen, Boiman never accepted the proposal to set an early termination date rather than thirty days from notice as provided in the parties' contracts.  Roizen Decl. ¶ 50.  There is thus some dispute as to whether the tail period ended September 30, 2018 or October 14, 2018.  *See* Opp'n at 6 n.8.  Neither party suggests that the precise termination date affects the outcome of the present motions.  *See* Magisto MSJ at 3 n.18.

1

### 4.       2018: Further Contact with IAC and Advsr's Late-Stage Involvement

In July of 2018, Advsr received electronic notification that IAC had accessed a presentation Advsr had prepared on Magisto, and Advsr alerted Magisto of that access and offered to contact IAC.  Roizen Decl. ¶¶ 60–61.  On August 1, 2018, Magisto's vice president of busines development Uli Gal-Oz emailed Advsr to request an in-person meeting (or by videoconference if needed) to update Advsr on Magisto's business and "brainstorm about next steps" because "[a] lot ha[d] happened in the past 6 months."  Roizen Decl. ¶ 62 & Ex. 46.

Vimeo CEO Anjali Sud emailed Boiman on August 5, 2018 indicating that Vimeo was "accelerating [its] exploration of the creation/editing space" and requesting a meeting in Tel Aviv on August 14th to discuss Vimeo's plans and Magisto's business.  Boiman Decl. Ex. 25.  That outreach came as a surprise to Boiman because he had not heard from IAC or Vimeo in several months.  Daniel Decl. Ex. 2 (Boiman Dep.) at 226:5–10. Later, Boiman learned that Vimeo had pivoted its strategy due to new leadership.  *Id.* at 226:16–228:6.  Vimeo was at this point interested in purchasing Magisto in order to own Magisto's technology and incorporate it into Vimeo's product.  Lorin Decl. Ex. 11 (Cheah Dep.) at 110:19–111:6.  According to IAC vice president Mattocks Swenson, IAC was pursuing discussions with a number of "other companies in the video editing and creation space" during this time, and had exchanged documents and entered nondisclosure agreements with some of them.  Daniel Decl. Ex. 5 (Swenson Dep.) at 43:6–46:12.

Boiman forwarded his exchange with Sud to Roizen, who proposed that Advsr could reach out to IAC for more information, but Boiman decided to hold off at least until after the meeting in order to not appear too enthusiastic about a deal.  Boiman Decl. Ex. 25.  Gal-Oz emailed Roizen after the meeting to report that it went well and that Vimeo was "supposed to come back to us with interest, price range, and due diligence plan," and that once Magisto heard back from Vimeo, "it would be great to engage [Advsr] in the process."  *Id.*  Roizen states in his declaration that he understood that email as expressing intent to reengage Advsr as Magisto's banker, and that while he "was not sure if as a legal matter the SOW was now 'un-terminated' or extended or if new informal agreement was formed," Advsr "operated on good faith" and believed Gal-Oz had authority to reengage Advsr.  Roizen Decl. ¶ 68.

United States District Court
Northern District of California

1      In August of 2018, Roizen sent text messages to a colleague indicating that in order to

2   satisfy the Transaction SOW's "entered into" clause, Advsr "[n]eed[ed] to get IAC into something

3   like an M&A conv[ersation] by sep[tember] 30," and that a deal did "not have to be closed" so

4   long as a "meaningful deep dive around m&a" occurred.  Roizen Decl. ¶ 21.[4]

5      On August 17, 2018, Magisto asked Advsr to prepare a valuation for Magisto to combat an

6   anticipated "lowball" offer by IAC.  Roizen Decl. ¶ 71.  While Magisto suggested using traditional

7   valuation metrics, Advsr recommended instead using its "Magic Box" principles to prepare a

8   "combination model" identifying specific potential synergies between Magisto and Vimeo, and

9   letting IAC and Vimeo make the first offer on valuation.  *Id.*  The combination model was well

10   received by Magisto, and Magisto entrusted Advsr to present the model to IAC's corporate

11   development team on August 31, 2018, which reinforced Roizen's view that Magisto had decided

12   to reengage Advsr as its banker.  Roizen Decl. ¶¶ 76–77.  The presentation was also well received

13   by  IAC's employees, and they expressed their intent to pursue further diligence requests,

14   indicating serious interest in a deal.  Roizen Decl. ¶ 78.

15      The need for revisions to the nondisclosure agreement stalled negotiation in late August,

16   because Magisto was not willing to share extremely sensitive data under the terms of the existing

17   agreement, which contained a "residuals clause" that would have permitted IAC to use the

18   information it received.  Roizen Decl. ¶¶ 81–82.  IAC, Advsr, and Magisto exchanged emails on

19   September 5, 2018 discussing the terms of a nondisclosure agreement.  Boiman Decl. Ex. 10.  IAC

20   initially resisted removing the residuals clause but ultimately agreed to do so, in what Sud

21   characterized at her deposition as essentially a bluff to act as if IAC provided a significant

22   concession when in fact it was not particularly concerned about omitting the clause.  Daniel Dep.

23   Ex. 4 (Sud Dep.) at 91:20–92:8.

24

25   _____

[4] Roizen and Advsr cite, in various contexts, three different exhibits as purportedly containing
26   those text messages.  *See* Roizen Decl. ¶ 21 (citing Exhibit 10); Roizen Decl. ¶ 21 n.4 (citing
Exhibit 116); Opp'n at 25 (citing Exhibit 64).  Of those, Exhibits 10 and 64 are unrelated
27   documents, and Exhibit 116 does not exist.  These are not the only exhibits erroneously cited in
Advsr's filings.  The Court nevertheless finds Roizen's declaration of the contents of the text
28   messages sufficient to accept, at least for the purpose of Defendants' motions for summary
judgment, that they occurred.

United States District Court
Northern District of California

1    On September 10, 2018, Gal-Oz sent Roizen an email asking how he felt about a list that

2    Gal-Oz had previously sent and how he would like to move forward.  Boiman Decl. Ex. 14.

3    Roizen forwarded that email to Boiman the same day with a suggestion to extend the tail period:

> Hey Oren – Uli has some help he needs (or would like) on transitioning some relationships where we/Advsr are a bit closer – and I think the way we want to play things with IAC is going to have several moves (and also may involve other players) – to that end, we/Advsr don't need to fully-re-engage, but how about we extend our tail period another 3 months (through to the end of 2018).
>
> That should give us sufficient coverage, and in that context we'd be happy to also help on other fronts (like the Uli project below).
>
> Then we can decide on what, if anything, makes sense for the next phase of our relationship in 2019. There's enough potential on our end that we'd take that extension [winking face emoji]
>
> Work for you?
>
> I think we all make a good team!

*Id.*

14    On September 11, 2018, Roizen spoke with IAC's vice president Swenson about IAC's

15    work towards determining a valuation for Magisto, leaving Roizen with a general sense of what

16    IAC might pay (a broad range that encompassed the purchase price at which the transaction closed

17    several months later), which he conveyed to Boiman.  Roizen Decl. ¶ 93 & Ex. 57.  Swenson

18    indicated that IAC could provide more concrete valuation guidance after conducting further due

19    diligence.  *Id.*  Boiman asked Roizen on September 17, 2018 to push for a valuation range, and

20    Roizen believes that he could have obtained a term sheet or letter of intent, but he did not pursue a

21    written document because that ran counter to his Magic Box approach of avoiding intermediate

22    documents before a final agreement.  *Id.* ¶¶ 96–97.

23    On September 24 and 28, 2018, Boiman and Roizen traded text messages about

24    conversations with IAC.  Boiman Decl. Exs. 11–12.  On September 28, 2018, IAC verbally

25    provided Roizen with a valuation range for Magisto, indicating that it might be paid either solely

26    in cash or partially in cash and partially in Vimeo equity, which IAC viewed as a non-binding

27    "[h]igh-level zip code of what [it] thought the company was worth," but Roizen viewed as an

28    "offer."  *See* Defs.' Sealing Mot. Ex. 16.; Daniel Decl. Ex. 5 (Swenson Dep.) at 99:21–100:7;

Roizen Dep. at 100–01.  Roizen acknowledged at his deposition that valuation guidance is generally not binding.  Daniel Decl. Ex. 3 (Roizen Dep.)  at 170:19–24.  Zilka did not recall at his deposition when Magisto's board learned of that valuation range, and stated that conflicts for some board members might have precluded him and Boiman discussing the negotiations with those directors.  Daniel Decl. Ex. 1 (Zilka Dep.) at 170:11–171:9.

In telephone discussions regarding the "offer" or valuation range on September 28, 2018, Roizen

> asked Mr. Boiman to confirm, so that there would be no "gray area" about it, that Advsr would be paid by Magisto if the Transaction closed. Mr. Boiman responded that Magisto greatly appreciated Advsr's efforts and that there was "no question" that Advsr would be paid if the Transaction was consummated.

Roizen Decl. ¶ 104 (emphasis omitted); *see also id.* ¶ 110.  Boiman testified at his deposition that he recalled telling Roizen that he thought the board of directors would approve compensation for Advsr.  Lorin Decl. Ex. 1 (Boiman Dep.) at 432:19–435:20.

Also on September 28, 2018, Boiman sent the following email to Sud:

> Hi Anjali,
> I got the summary of the discussion regarding the potential range of the deal.
> First, I want to thank you for the efforts to get to this point. The depth of the discussion shows how serious your team is about completing a deal.
>
> Second, the range is definitely worthy to start getting into the details. Yet I can't say for sure how will the BOD or new investors react to it, especially as the low end is quite close to our current valuation and there are more investors still trying to get in with higher valuation.
> I need to test the water with few of the BOD members / investors to get their reaction, and I will do it over the next week.
>
> Assuming I'll get OK to continue exploring, I'd like to spend more time with your team and especially with you, to better understand your vision on making this successful. From team composition and merging, leadership/founders roles to joint GTM and integration plans. I'd be glad to contribute to the thought process and learn your perspective.
>
> I should be able to find time, in the next week or so, for a visit in your office (unless you happen to be in CA soon) or schedule some long conference calls if your schedule is too packed.
>
> Let me know what works.
> This is getting interesting!

12

United States District Court
Northern District of California

1

2

        Cheers
        Oren

3 Boiman Decl. Ex. 13.  Sud responded the next day that her team was also "serious and excited

4 about the possibilities here" and that she "[l]ook[ed] forward to hearing back once you discuss

5 with your BOD."  *Id.*  She proposed dates in early October to meet in New York "and spend time

6 digging in further."  *Id.*  At the time, Sud was also pursuing similar conversations with other

7 companies and had provided them at least informal valuation ranges as well, in what she

8 characterized as an effort "to keep all the players warm and talk to all of them and get as much

9 information as possible.  Daniel Decl. Ex. 4 (Sud Dep.) at 107:21–108:9; *see* Daniel Decl. Ex. 5

10 (Swenson Dep.) at 104:6–12.

11       Magisto "continued to ask for and make use of Advsr's services to help with the

12 developing Transaction" after receiving IAC's valuation guidance on September 28th.  Roizen

13 Decl. ¶ 114.  Roizen turned down work for other clients because he believed he would be focusing

14 on the deal between Magisto and IAC, and drafted a presentation he intended to deliver to

15 Magisto's board.  Roizen Decl. ¶¶ 114–15 & n.30.  On October 11, 2018, Swenson called Roizen

16 to express that IAC was "dead serious" and wanted to move quickly towards closing.  *Id.* ¶ 116.

17 According to Roizen, Boiman reaffirmed that Advsr would be paid:

18

19

20

21

22

        Around this time, Mr. Boiman disclosed to me over the phone that
        Magisto was planning to "shop" the September 28 Offer and was
        considering hiring another bank to do so. I told him that I saw no
        problem with this, as long as Advsr would still get paid for the
        IAC/Vimeo transaction. He agreed that this was the case. Mr. Boiman
        had been consistent on this point and had affirmed as early as
        December 14, 2017 that Advsr would get paid for a deal with
        IAC/Vimeo.

23 Roizen Decl. ¶ 117.  Boiman asked if Advsr might be interested in shopping the deal to other

24 potential buyers, and Roizen added "an 'Advsr Re-Intro' section" to the end of his presentation on

25 the IAC negotiations in order to make that pitch to Magisto's board.  Roizen Decl. ¶¶ 118–19.

26 Roizen asked Boiman to allow him to present to the board, but Boiman told him to meet with

27 Zilka instead, told Roizen for the first time that Zilka had been critical of Advsr's performance in

28 2017, and indicated that Roizen would need to persuade Zilka to agree to choosing Advsr for the

role of shopping the deal.  Roizen Decl. ¶¶ 120–21.

Zilka testified that he only became aware in late September of 2018 that Boiman was still working with Advsr, and he was surprised to learn that because the Transaction SOW had been terminated.  Daniel Decl. Ex. 1 (Zilka Dep.) at 104:5–105:6.  Zilka and Roizen met near San Francisco in October of 2018.  Daniel Decl. Ex. 1 (Zilka Dep.) at 105:8–17.  Roizen emailed Zilka on October 5, 2018 with a strategy presentation for their meeting the following week, arguing that "time is a factor as the Vimeo/IAC deal team on their end is moving quickly at this point, and they have gotten accustomed to a highly responsive Magisto/Advsr deal team on this end."  Zilka Decl. Ex. 2.  In the meeting, Zilka said that based on what Roizen told him about the degree of Advsr's work with IAC, Advsr "may be entitled to some compensation," and while that would be for the board to decide, Zilka would "look at it very, very favorably."  Daniel Decl. Ex. 1 (Zilka Dep.) at 162:23–163:17.  Roizen recalls Zilka stating that Advsr was "probably owed something," and that he did not press the issue of whether Advsr would be owed its full commission because "[i]t was a cordial meeting and it felt like not the moment to dive into that conversation."  Daniel Decl. Ex. 3 (Roizen Dep.) at 228:9–229:9.

Boiman testified that the meeting was intended to determine whether Advsr should be retained again as Magisto's banker, following the conclusion of the tail of its previous contract, to complete a deal with IAC, and that he felt a face-to-face meeting with Zilka would be more useful than a videoconference presentation to the full board.  He testified that he favored hiring Advsr again because it was already involved with the process, but "Yahal [Zilka] and other board members felt differently about the difference of quality you can get from different bankers," and that after the meeting, Zilka acknowledged that Advsr had put work into the deal "but ultimately, you know, he thinks still on the past failures of them and that it's going to be difficult to change his mind about how he thinks about them as investment bankers."  Lorin Decl. Ex. 1 (Boiman Dep.) at 398:1–402:24.

Following that meeting, Roizen asked Zilka and Boiman on October 15, 2018 how they would like to proceed with IAC, recommending that "[i]n an ideal world" Roizen would meet with IAC in New York to negotiate a deal and push "towards a full definitive agreement (continuing

our strategy of avoiding 'intermediary agreements' like LOIs, a strategy that has worked well thus far)." Zilka Decl. Ex. 8; Roizen Decl. ¶ 129. Zilka responded that he was ambivalent about the deal and would "let Oren [Boiman] take the lead as to IAC," and that "Oren will prepare his recommendation to the BoD as to which route the company should take and with whom." *Id.* The chairman of Magisto's board, Doron Birger, does not recall Boiman having addressed that issue to the board. Lorin Decl. Ex. 10 (Birger Dep.) at 127:7–12. Roizen infers based on his conversations with Zilka and Boiman—specifically, Boiman dodging requests by Roizen to present to the board—that Magisto's board of directors was not fully informed about the negotiations with IAC at this time. Daniel Decl. Ex. 3 (Roizen Dep.) at 208:1–222:3.

According to Roizen, Boiman became "increasingly evasive" in later conversations. Roizen Decl. ¶ 130. When emailed Boiman on October 18, 2018 to ask if Magisto was in contact with IAC because Roizen had not heard from IAC since October 11th, Boiman responded: "We're in direct contact with IAC. I'll call you later to give you an update, but we're handling this directly until further notice from our BOD." Roizen Decl. Ex. 67. Advsr received no further communication from Boiman. Roizen Decl. ¶ 131.

Ultimately, Magisto did not agree to compensate Advsr, which Zilka attributed to "the recommendation of the lawyers and Oren" Boiman, based on "the terms of the engagement with" Advsr. Daniel Decl. Ex. 1 (Zilka Dep.) at 168:2–13. Advsr, through counsel, sent a demand letter on November 12, 2018 seeking confirmation that it would be paid if the deal closed. Roizen Decl. ¶ 132. The demand letter asserted that the September nondisclosure agreement, due diligence process, and September 28, 2018 "offer" established that "IAC and [Magisto] entered into a Covered Transaction (i.e., a transaction for the sale of a majority of the stock or assets of the Company) prior to the end of the Tail Period," and Advsr would therefore be entitled to compensation if a deal was consummated. Roizen Decl. Ex. 68. It did not explicitly assert any other theory of entitlement to relief or reference Boiman's purported assurances that Advsr would be paid, but "note[d] that during and after the Tail Period, Advsr performed a material amount of services at the request of [Magisto]." *Id.* Counsel for Magisto sent a response on November 25, 2018, stating Magisto's position that it "had not entered into any 'Covered Transaction'" as of the

15

1    September 30, 2018 conclusion of the tail period, and rejecting Advsr's claim.  Roizen Decl. ¶ 113

2    & Ex. 70.

3        After receiving Advsr's demand letter, Zilka emailed Boiman, writing:  "We should have

4    engaged and reacted first!!!  Now there is a document that we need to disclose indicating who is

5    the potential acquirer and value."  Roizen Decl. Ex. 69.  He testified at his deposition that he was

6    referring to his view that Magisto should have initiated negotiations with Advsr for "some level of

7    low compensation," "because of the fouls that the company has -- may have made, in terms of

8    interaction with them, and the kind of activity that he at least described to me."  Lorin Decl. Ex. 2

9    (Zilka Dep.) at 196:3–20.   Boiman responded:

> We have a legal team and we listen to their advice.
> They recommended we wait for their letter, and here it is.
> We don't need to do anything right now.
> I have an update meeting with the legal team tomorrow evening Israel
> time.
> As you can see Ezra [Roizen] was left out of the loop since the end of
> the tail, until we notified IAC not to contact him as well.

14   Roizen Decl. Ex. 69.

15       **5.     2018–2019: Deutsche Bank Negotiations and Conclusion of Deal**

16       In early October, Magisto began discussions with Deutsche Bank about potentially

17   retaining Deutsche Bank to secure an acquisition, and came to "handshake terms" under which

18   Deutsche Bank began work by mid-October.  *See* Daniel Decl. Ex. 6 (Schwartz Dep.) at 35:4–

19   36:17.  During those discussions, Boiman represented that Magisto was in very serious discussions

20   with a potential buyer, and had received an offer at the high end of IAC's stated valuation range

21   and could likely obtain a term sheet within days on request, which was apparently a reference to

22   (and perhaps exaggeration of) IAC having provided that valuation.  Lorin Decl. Ex. 3 (Schwartz

23   Dep.) at 71:12–25; Roizen Decl. Ex. 60.  In a reference to Advsr and Roizen, Boiman told

24   Deutsche Bank that Magisto had "approached the current offeror over a year ago, via a single

25   person boutique," and that while "[t]he boutique's tail is over now," Boiman "would like to

26   compensate him in case of a deal."  Roizen Decl. Ex. 60 (notes taken by Deutsche Bank).

27       In the course of negotiations with Deutsche Bank, Zilka sent Boiman text messages on

28   October 18, 2018 reading "The tail short be short as possible" and "Tell them we were hurt

significantly by the tail and the BoD will not do the same mistake twice." Lorin Decl. Ex. 37.

Boiman responded:

> In this case you're betting on a good banker, thus it's a different kind of risk… but still, will try to get it to 12 month, they won't give us 9 month like Ezra [Roizen] did, which might cost him a lot….

*Id.* (ellipses in original).

Deutsche Bank set up a new data room to allow IAC and Magisto to conduct further due diligence,[5] and remained in close contact with IAC through the conclusion of the deal. Daniel Decl. Ex. 5 (Swenson Dep.) at 160:25–162:5. Magisto formally engaged Deutsche Bank on December 4, 2018. Boiman Decl. Ex. 17.

On October 22, 2018, IAC requested additional information from Magisto, and Sud emphasized that because "IAC is a data-driven company," she would not "be able to go back to them to secure a more concrete commitment on valuation without this info." Boiman Decl. Ex. 18.

On November 14, 2018, Boiman and Zilka met with IAC in Los Angeles. Going into that meeting, IAC had expressed intent to offer payment in Vimeo stock, which Boiman and Zilka considered unacceptable at least in part due to the fact that Vimeo was a private company, and at the meeting they offered to pay cash but at the low end of the September valuation range, which Boiman and Zilka also found unacceptable. Lorin Decl. Ex. 1 (Boiman Dep.) at 555:4–557:17. Deutsche Bank had discussed with Boiman and Zilka pushing for a cash rather than stock deal, noting concerns that Vimeo's then-private stock was not liquid and the timing of an IPO was uncertain, and writing in meeting notes that Zilka "should talk about how he needs liquidity since he's closing [his] current [venture capital] fund and starting a new fund." Lorin Decl. Ex. 31. At the meeting with IAC, Boiman stated that a stock-only deal was a "dead end," prompting the shift to a cash offer at the same valuation. Lorin Decl. Ex. 2 (Boiman Dep.) at 558:18–559:3.

The next day, Swenson sent Magisto a letter of intent (the "November LOI") and requested

---

[5] Because Deutsche Bank set up a new data room, Roizen's statement that he did not receive notice of Magisto or IAC accessing the old data room after September 28, 2018 does not support his conclusion that no further due diligence was conducted. *See* Roizen Decl. ¶ 135.

United States District Court
Northern District of California

a response from Magisto's board of directors by November 21, 2018.  Boiman Decl. Ex. 19.  The November LOI called for an acquisition of Magisto's stock in exchange for cash paid by IAC at the low end of the September range.  Boiman Decl. Ex. 24.  The November LOI was explicitly not binding except as to nondisclosure and short-term exclusivity provisions, and contemplated further agreements to complete a transaction.  *Id.*  Zilka testified that he would have preferred an LOI in September or October, and had advised Magisto's team that getting a detailed document was "the most important thing."  Daniel Decl. Ex. 1 (Zilka Dep.) at 205:5–206:13.  Magisto presented the terms of the November LOI to its board, but ultimately rejected the November LOI and did not sign it.  Lorin Decl. Ex. 44; Daniel Decl. Ex. 2 (Boiman Dep.) at 576:19–24.

In December of 2018, IAC slightly increased its offer, but included a stock component as opposed to all cash for payment, which Magisto opposed.  Lorin Decl. Ex. 3 (Schwartz Dep.) at 168:13–171:2.  During discussion of terms in December, 2018, Zilka wrote in an email to Boiman, "I would not include the date of the NOA signed on September 4th -let's discuss."  Lorin Decl. Ex. 53.

On January 14, 2019, Vimeo sent Magisto a new LOI (the "January LOI"), which Magisto accepted the same day.  Boiman Decl. Ex. 20.  As with the November  LOI, the January LOI was explicitly not binding except as to nondisclosure and short-term exclusivity provisions, and contemplated further agreements to complete a transaction.  *Id.*  IAC increased its offer, which was still in cash, based both on its reassessment of its own strategy and on strong performance in December by Magisto.  Daniel Decl. Ex. 4 (Sud Dep.) at 145:5–146:1.

A Magisto presentation from February of 2019 compared the terms of the LOI to a potential asset purchase, apparently in response to an IAC proposal to structure the deal as an asset purchase rather than an acquisition of Magisto's stock.  Boiman Decl. Ex. 21.  Zilka emailed Mark Stein at IAC on February 2, 2019, stating that the asset purchase structure imposed additional tax burdens on Magisto's shareholders, and that while Magisto would be open to that structure, the purchase price would need to fully compensate its shareholders for those additional taxes.  Zilka Decl. Ex. 3.  Stein responded on February 8, 2019, increasing IAC's offer but not to the full extent Zilka had sought.  Zilka Decl. Ex. 5.  Thomas Cho of Deutsche Bank emailed Stein on February

18

11, 2019 thanking him for his latest proposal and listing a number of principles that would be important to Magisto in converting the deal to an asset purchase.  Zilka Decl. Ex. 4.  Cho emailed Stein again on February 16, 2019, noting that Magisto had received IAC's latest letter of intent but wanted to see a draft of "the definitive agreement" before agreeing to extend the exclusivity period in which it could not court other potential buyers.  Zilka Decl. Ex. 6.

On February 28, 2019, Boiman emailed Zilka and others discussing ways to optimize the deal to avoid tax liability.  Lorin Decl. Ex. 56.  Magisto's chairman Doron Birger chimed in that he believed the deal was acceptable, and provided an estimate of maximum exposure.  *Id.*  Zilka responded: "Please delete ALL correspondence on this matter ASAP!!!"  *Id.*  At his deposition, Zilka testified that he was referring to Boiman's, "you know, obsession with his tax situation," and that he believed such matters were better not discussed over email due to concerns about Israeli tax authorities and emails potentially becoming available to Boiman's future employer after an acquisition.  Daniel Decl. Ex. 1 (Zilka Dep.) at 221:17–223:17.  Boiman testified that he called Zilka after receiving that email and Zilka explained that documenting a potentially more favorable tax treatment than had previously been discussed could adversely affect Magisto's bargaining position with IAC.  Daniel Decl. Ex. 2 (Boiman Dep.) at 619:20–620:21.  Boiman did not recall whether he actually deleted any correspondence.  *Id.* at 621:8–13.

On April 11, 2019, Vimeo and Magisto executed an asset purchase agreement.  Boiman Decl. Ex. 23.  The final purchase price was above the valuation range that IAC provided in September of 2018, but if the increase intended to account for the extra tax liability as a result of restructuring the deal as an asset purchase were disregarded, the remaining amount falls within the valuation range originally discussed.  Vimeo had only ceased pursuing other targets for acquisition in the spring of 2019.  Daniel Decl. Ex. 5 (Swenson Dep.) at 155:1–3.

Magisto's chairman Doron Birger learned that Advsr was asserting a right to payment around the same time the deal closed, and he testified that he and other board members were "shocked" because they did not believe that Advsr had done any work to secure the deal.  Lorin Decl. Ex. 10 (Birger Dep.) at 145:8–146:22.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## B.    Procedural History and Claims Asserted

Advsr initially filed this action in May of 2017 against only Magisto, and Magisto answered the complaint. *See* dkts. 1, 24. In late 2019, the parties stipulated to Advsr filing its operative first amended complaint, which added Zilka as a defendant. *See* 1st Am. Comp. (dkt. 50). In its amended complaint, Advsr asserts the following claims against Magisto: (1) breach of the Transaction SOW, an express contract, *id.* ¶¶ 122–33; (2) breach of implied contract, *id.* ¶¶ 134–41; (3) breach of the implied covenant of good faith and fair dealing, *id.* ¶¶ 142–53; (4) fraud, *id.* ¶¶ 153–64; (5) quantum meruit, *id.* ¶¶ 165–71; (6) promissory estoppel, *id.* ¶¶ 172–80; and (7) unjust enrichment, *id.* ¶¶ 181–85. Advsr also asserts two claims against Zilka: (8) intentional interference with contractual relations, *id.* ¶¶ 186–92; and (9) intentional interference with prospective economic relations, *id.* ¶¶ 193–200.

Magisto again answered the amended complaint, but Zilka moved to dismiss, arguing that most of his alleged conduct had no causal relationship to Advsr's alleged harm, and that the manager's privilege shielded him from liability for an alleged instruction not to pay Advsr's fee because that was based at least in part on Magisto's interests. On February 28, 2020, the Court denied that motion, holding that the "predominant motive" test of *Huynh v. Vu*, 111 Cal. App. 4th 1183, 1196–200 (2003), rather than the "mixed motive" test of *Los Angeles Airways, Inc. v. Davis*, 687 F.2d 321, 328 (9th Cir. 1982), set the scope of the manager's privilege under California law, and Advsr's allegations did not "reveal[], as a matter of undisputed fact, that Zilka was 'predominantly' motivated by Magisto's interests." Order re Mot. to Dismiss (dkt. 71).[6] Because Zilka's alleged instruction not to pay Advsr was sufficient to satisfy the causation element of the claims against him, the Court did not reach the question of whether any of his other alleged conduct met that test. *See id.* at 9.

Defendants filed their present motions for summary judgment on May 5, 2021. Trial is set to begin November 1, 2021, with a pretrial conference on October 15, 2021.[7]

---

[6] *Advsr, LLC v. Magisto Ltd.*, No. 19-cv-02670-JCS, 2020 WL 978610 (N.D. Cal. Feb. 28, 2020).
[7] The parties have discussed the possibility of continuing the trial date. This order does not address the question of whether a continuance is warranted.

United States District Court
Northern District of California

### C.   The Parties' Arguments

#### 1.   Breach of Express Contract

Magisto contends that it is entitled to summary judgment on Advsr's claim for breach of the Transaction SOW because the "preliminary discussions" that occurred during the tail period of that contract did not rise to the level of the parties having "entered into" a "Covered Transaction." Magisto MSJ (dkt. 110) at 9–16.  According to Magisto, Advsr misconstrues the events that occurred during that time and relies on a broader interpretation of the contract language than its plain meaning can reasonably support.  *See id.*

Advsr contends that "entering into" a transaction encompasses serious negotiations towards completion of the transaction, that the September nondisclosure agreement constitutes one of a "series of transactions" as contemplated by the Transaction SOW, and that a number of people at Magisto, Deutsche Bank, and IAC referred to the September 28, 2018 valuation range as an "offer," which in Advsr's view satisfies the "entered into" standard.  Opp'n (dkt. 120) at 20–34. Advsr also contends that Magisto violated the contract's prohibition on intentionally structuring or delaying a deal to avoid paying Advsr's fee.  *Id.* at 34–36.  Advsr argues that the parties' conduct evinces an intent to amend the Transaction SOW to extend the tail period, and that Magisto waived, or should be estopped from enforcing, the cutoff of the tail period.  *Id.* at 36–38.

Magisto argues in its reply that any ambiguity in what constitutes "entering into" a transaction or the definition of a "Covered Transaction" should be construed against Advsr because Advsr drafted those portions of the Transaction SOW and the parties did not specifically negotiate them.  Reply (dkt. 122) at 2.  According to Magisto, Advsr's focus on a broad definition of "transaction" misses the point that a "*Covered* Transaction is specifically defined in the contract.  *Id.* at 2–3.  Magisto also argues that "meaningful discussions" cannot be the standard for whether the parties entered into a "Covered Transaction" because it is unworkable.  *Id.* at 3–7. Magisto disputes Advsr's characterization of the September 28, 2018 valuation discussions as an "offer" and "acceptance" because the terms the parties discussed were too indefinite to be enforceable and there is no evidence any party believed them to be binding.  *Id.* at 7–8.  Magisto contends that the sort of "series of transactions" contemplated by the Transaction SOW is a multi-

stage merger or acquisition, not preliminary discussions and nondisclosure agreements preceding a firm deal.  *Id.* at 9.  Magisto further argues that there is no evidence that it intentionally delayed a deal or agreed to extend the tail period.  *Id.* at 9–13.

### 2.    Breach of Implied Contract

Magisto argues that there is no evidence of an implied contract, because all of the conduct at issue is consistent with Magisto and Advsr having collaborated during the tail period based on the potential for Advsr to earn a commission if a sale was completed during that time.  Magisto MSJ at 16–18.  Magisto also argues that Advsr's November 2018 demand for payment—which referenced only the Transaction MSJ—is inconsistent with its theory of a separate implied contract, and that California law does not recognize implied contracts where an express contract governs the same subject matter.  *Id.* at 18–19.  To the extent Advsr's claim could be construed as asserting that the parties agreed to modify the Transaction SOW, Magisto contends that such a modification would violate the SOW's integration clause, and that California law does not permit implied modifications to an express contract.  *Id.* at 19–20.

Advsr argues that California law does not consider an implied contract governing a different time period or different conduct to be foreclosed by a written contract, and that Advsr can therefore pursue a claim that there was an implied contract to pay Advsr if a deal between Magisto and IAC finalized after the tail period set by the Transaction SOW.  *Id.*  Opp'n at 38–39.  Magisto argues in its reply that it is absurd to think Magisto would have fired Advsr but simultaneously agreed to compensate it on terms more permissive than the original contract, and the work at issue is identical such that the express contract controls.  Reply at 13–15. Magisto also contends that all of the parties' conduct is consistent with the express contract, because Advsr's work during the tail period *could* have secured it compensation *if* a deal was reached during that time.  *Id.* at 15–16.

### 3.    Implied Covenant of Good Faith

Magisto contends that Advsr's claim based on the implied covenant of good faith and fair dealing fails because it is duplicative of Advsr's breach of contract claim, and because there is no evidence that Magisto worked to delay approval of a deal by its board of directors or conceal

United States District Court
Northern District of California

1  Advsr's work from the board.  Magisto MSJ at 20.  Advsr argues that "the record is replete with

2  [such] evidence."  Opp'n at 39.  Magisto's reply falls back on the argument that this claim is

3  redundant to Advsr's breach of contract claim because it is based on assertions that Magisto failed

4  to pay the fee and delayed the completion of a deal, both of which correspond to obligations set by

5  the Transaction SOW.  Reply at 17.

6           **4.    Fraud**

7           Magisto argues that Advsr's fraud claim improperly seeks to recast a contract theory as a

8  tort, that Magisto never promised to pay Advsr outside the tail period, and that the parties' conduct

9  and communications show that Advsr believed it needed to secure a transaction within the tail

10  period in order to get paid, negating Advsr's ability to prove reliance.  Magisto MSJ at 21–23.

11          Advsr responds that, among other representations by Magisto, Boiman repeatedly told

12  Advsr it would be paid if a deal closed between Magisto and IAC, and that with respect to work

13  performed in August and September of 2018, Advsr relied on those representations because it

14  would not be reasonable at that time to expect a deal to close before the end of the tail period.

15  Opp'n at 39–41.  Advsr contends that the M&A world operates on good faith and "handshake"

16  deals are common, as evidenced by Deutsche Bank's work for Magisto for several months before

17  a contract was formalized.  *Id.* at 40–41.

18          Magisto contends in its reply that Advsr has not identified any fraudulent or extra-

19  contractual promise, that Boiman and Zilka's references to compensation around the end of the tail

20  period are best construed as suggesting only a possibility of some gratuitous payment rather than a

21  promise to pay Advsr's three-percent fee, and that Advsr could not have detrimentally relied on

22  Zilka's statement because it performed no work after Roizen met with him in October.  Reply at

23  17–18.

24          **5.    Equitable Claims Against Magisto**

25          Magisto seeks summary judgment on Advsr's quantum meruit, promissory estoppel, and

26  unjust enrichment claims primarily on the basis that none of those theories can lie where a valid

27  contract exists.  Magisto MSJ at 23–25.  Advsr responds that its claims are based on the period

28  after the Transaction SOW was terminated.  Opp'n at 42–44.

23

### 6. Claims Against Zilka

Advsr asserts claims against Zilka for intentional interference with contract and prospective economic relations. Zilka contends that those claims fail because there was no breach or disruption, Zilka MSJ (dkt. 111) at 11–12, there is no evidence that Zilka took any intentional act to disrupt Advsr's contract, *id.* at 12–18, there is no evidence that Zilka's conduct caused Advsr's harm, *id.* at 18–19, and there is no evidence of an implied contract or Zilka's knowledge thereof, *id.* at 19. For the prospective advantage claim, Zilka argues that Advsr has not shown any independently wrongful act. *Id.* at 20. Zilka also contends that all of his purported conduct is protected by the manager's privilege because he acted in the interest of Magisto rather than for any separate personal interest. *Id.* at 20–22.

Advsr argues that it has identified sufficient evidence of each element of the claims, that Zilka's conduct was independently wrongful because he breached his fiduciary duties by concealing information from the full board of directors and negotiating a suboptimal deal, and that he is not shielded by the manager's privilege because he acted based on a personal interest to secure a cash rather than stock deal in order to maintain the liquidity of his venture capital fund. Opp'n at 44–49.

## III. ANALYSIS

### A. Legal Standard

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "'specific facts showing there is a genuine issue for trial.'" *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record

United States District Court
Northern District of California

1  . . . .").  "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the

2  substantive evidentiary standard of proof that would apply at the trial on the merits."  *Anderson v.*

3  *Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986).  The non-moving party has the burden of

4  identifying, with reasonable particularity, the evidence that precludes summary judgment.  *Keenan*

5  *v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  Thus, it is not the task of the court "'to scour the

6  record in search of a genuine issue of triable fact.'"  *Id.* (citation omitted); *see Carmen v. S.F.*

7  *Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

8      A party need not present evidence to support or oppose a motion for summary judgment in

9  a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable

10  to presentation in an admissible form.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036−37 (9th Cir.

11  2003).  Neither conclusory, speculative testimony in affidavits nor arguments in moving papers

12  are sufficient to raise genuine issues of fact and defeat summary judgment.  *Thornhill Publ'g Co.,*

13  *Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  On summary judgment, the court draws all

14  reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378

15  (2007), but where a rational trier of fact could not find for the non-moving party based on the

16  record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate.

17  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

18      **B.    Claims Against Magisto**

19          **1.    Breach of Express Contract (Transaction Statement of Work)**

20      Under California law, the "cause of action for damages for breach of contract is comprised

21  of the following elements: (1) the contract, (2) plaintiff's performance or excuse for

22  nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff."  *Armstrong*

23  *Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, 1391 n.6 (2004).  Here, the

24  parties primarily dispute the element of breach, which turns on interpretation of whether Magisto

25  "entered into" a "Covered Transaction" during the tail period within the meaning of those terms in

26  the Transaction SOW.

27      California Civil Code section 1636 provides that a "contract must be so interpreted as to

28  give effect to the mutual intention of the parties as it existed at the time of contracting, so far as

the same is ascertainable and lawful." Cal. Civ. Code § 1636.  "Although the intent of the parties determines the meaning of the contract, the relevant intent is the objective intent as evidenced by the words used by the parties and not either party's subjective intent." *Kashmiri v. Regents of Univ. of Cal.*, 156 Cal. App. 4th 809, 838 (2007).  "Where contract language is clear and explicit and does not lead to absurd results, [courts] normally determine intent from the written terms alone." *Id.* at 831 (citing Cal. Civ. Code §§ 1638–39).  In interpreting the written terms, courts read the contract as a whole and construe its terms in a manner that is reasonable and fair. *Cal. Nat'l Bank v. Woodbridge Plaza LLC*, 164 Cal. App. 4th 137, 143 (2008).  Courts read terms as understood in their ordinary and popular sense.  Cal. Civ. Code § 1644.

A contract is ambiguous when "it is capable of two or more constructions, both of which are reasonable." *La Jolla Beach & Tennis Club, Inc. v. Indus. Indem. Co.*, 9 Cal. 4th 27, 37 (1994).  If terms are ambiguous or uncertain, the court should rely on "the reasonable expectation of the parties at the time of the contract." *Kashmiri*, 156 Cal. App. 4th at 832; *accord* Cal. Civ. Code § 1636. The parties' reasonable expectation is determined by "the totality of the circumstances . . . shown by the acts and conduct of the parties, interpreted in the light of the subject matter and of the surrounding circumstances." *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 681 (1988); *accord* Cal Civ. Code § 1647.  Where there is doubt as to the intent of the parties, ambiguities in written agreements are to be construed against the drafters, a rule that "applies with particular force in the case of a contract of adhesion." *Sandquist v. Lebo Auto., Inc.*, 1 Cal. 5th 233, 247 (2016) (citing Cal. Cive Code § 1654; Rest. 2d. Contracts, § 206).

"Interpretation of a written instrument becomes solely a judicial function only when it is based on the words of the instrument alone, when there is no conflict in the extrinsic evidence, or a determination was made based on incompetent evidence.  But when . . . ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact that may properly be resolved by the jury." *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 395 (2008) (citations omitted).  Such evidence may include expert testimony. *Id.* (quoting *Warner Constr. Corp. v. City of Los Angeles*, 2 Cal. 3d 285, 289 (1970)).  "A party's conduct

26

occurring between execution of the contract and a dispute about the meaning of the contract's terms may reveal what the parties understood and intended those terms to mean," and "evidence of such conduct . . . is admissible to resolve ambiguities in the contract's language." *Id.* at 393.

Here, the parties' contract dispute turns primarily on the meaning of the phrase "entered into" as applied to a "Covered Transaction." There is no question that the asset purchase agreement ultimately reached between Magisto and IAC/Vimeo was a "Covered Transaction," or that the parties contemplated a "Covered Transaction" while negotiations were ongoing during the tail period of Advsr's contract. The question is whether Magisto had "entered into" such a transaction before the end of the tail period—perhaps most notably, when IAC provided valuation guidance on September 28, 2018.

There is at least some evidence and reasoning to suggest that the parties, or at least Magisto, had a narrower concept of what "entered into" meant, such that the valuation guidance and other negotiations did not meet that test. In common parlance, parties are said to have "entered into" a contract or relationship when an agreement is actually reached; perhaps the parties here intended the same with respect to "entering into" a Covered Transaction. Defendants' expert witness Steven Pully states in his report that "a sale cannot have been entered into without a transaction closing." Lorin Decl. Ex. 13 (Pully Report) ¶ 64. Boiman testified at his deposition that "entering into" a Covered Transaction would require an agreement at least as to key terms. Lorin Decl. Ex. 1 (Boiman Dep.) at 111:3–112:5.

On Defendants' motions for summary judgment, however, the question is not whether a jury *could* find in Defendants' favor, but whether it *must* do so. The Court is satisfied that, on its face, the undefined term of Magisto having "entered into" a Covered Transaction is ambiguous. That conclusion is reinforced by the parties' statements and conduct. LeRoy's expert opinion that M&A professionals would typically view the phrase broadly and as encompassing at least the September 28, 2018 valuation guidance—an opinion Defendants have not moved to exclude—supports Advsr's position that the Transaction SOW's language evinces mutual intent to cover that sort of step towards a final transaction. Roizen states that he and Boiman specifically discussed a broad scope of the tail. Roizen Decl. ¶¶ 11–13. Roizen's August 2018 text messages to a

colleague indicate that he believed a deal did "not have to be closed" so long as Advsr and Magisto got "IAC into something like an M&A conv[ersation] by sep[tember] 30," such that  a "meaningful deep dive around m&a" occurred.  Roizen Decl. ¶ 21.  That view accords with his declaration and deposition testimony.  While a party's "undisclosed intent or understanding is irrelevant to contract interpretation," their "subsequent conduct" can be relevant extrinsic evidence of their mutual intent.  *See Cedars-Sinai Med. Ctr. v. Shewry*, 137 Cal. App. 4th 964, 980 (2006) (citation omitted).  Roizen's subsequent text messages, suggesting that he actually believed the tail period was broad enough to encompass a "meaningful deep dive," could support an inference that his telephone conversations with Boiman about the scope of the tail were consistent with that understanding.

As for Magisto's intent, Boiman initially objected to the length and scope of the tail period, asking that the parties either "make the tail shorter (6 months) and general, or longer but more specific (e.g., for company discussions that materializes beyond some threshold)."  Boiman Decl. Ex. 26.  His suggestion that identifying "discussions that materializes beyond some threshold," *id.*, would suffice to make the contract more specific suggests that his concern was not with the *types* of deals defined as falling with "Covered Transactions," but with the degree of "discussions" or "materialization" necessary to establish that a transaction was "entered into."  Ultimately, the parties agreed to shorten the tail period but not otherwise modify its scope, indicating that the broad view of its scope that provoked Boiman's concerns—which would include even discussions that did not necessarily "materialize[] beyond some threshold"—remained effective in the final agreement.

At the hearing, defense counsel argued that Boiman's desire to specify some level at which discussions must "materialize" referred to setting a threshold to apply *before termination*, such that only transactions that had advanced to that point while the contract was in force would be eligible to earn Advsr its fee if they closed during the tail period.  The only possible reference to that argument in Magisto's motion is a passing assertion, within a factual summary, that Boiman "proposed either shortening the tail period or limiting consideration during the tail to companies that had progressed beyond preliminary discussions."  Magisto MSJ at 2.  At the hearing, defense

counsel cited that page of the motion and pages 108, 109, 117, and 118 of Boiman's deposition transcript as supporting the argument that Boiman was referring to thresholds reached before termination.  Hr'g Tr. (dkt. 132) at 24:10–20, 29:15–16 (the latter responding to a question by the Court at page 26, lines 19 through 21).  Pages 117 and 118 are not included in the excerpts submitted by either party.  At page 108—which is included only in the excerpts submitted by Advsr, not in the excerpts submitted with Magisto's motion—Boiman testified:  "I don't remember what we were trying to negotiate it to.  Obviously we're trying to get a shorter tail period."  Lorin Decl. Ex. 1 (Boiman Dep.) at 108:6–8; *see also id.* at 110:1–4 ("I don't know if there was change in the definition itself.  I know that the tail ended up shorter, I believe.  And whether there's other changes in language, I'm not sure.").  In the discussion of those negotiations that spans from page 105 through 112 of Boiman's deposition transcript, Boiman never addressed the statement in his email regarding "companies that had progressed beyond preliminary discussions."  *See id.* at 105:2–112:20.  Even if Boiman testified that he was referring to discussions before termination, that interpretation is not self-evident from what he wrote in the email, and a jury would not be required to credit his testimony as to what he meant at the time. Boiman's email expressing his concern that the tail, as written, was not limited to "discussions that materializes beyond some threshold" could support a conclusion that he understood "entering into" a transaction as encompassing the sort of discussions that occurred through September 28, 2018, and communicated that understanding to Roizen.

While contracts may in some circumstances be construed against the drafter, it is not clear that rule should apply where Magisto had opportunities to negotiate the Transaction SOW, specifically raised concerns about the breadth of the tail period, but ultimately agreed not to modify it while instead modifying other terms (including the length of the tail period). Regardless, even if it is not the only permissible interpretation of the facts, a jury could conclude from this record that while the face of the contract is ambiguous, once extrinsic evidence is considered—specifically, Boiman and Roizen's contemporaneous discussions of the scope of tail period—the parties' actual intent is not ambiguous.  Defendants' argument that section 1654 of the Civil Code precludes presenting that question to the jury is not consistent with the California

United States District Court
Northern District of California

courts' interpretation of that law:

> We reject appellant's contention that, because respondent drafted the offer, any ambiguity in the offer should be construed against it pursuant to Civil Code section 1654, which provides: "In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." The rule of section 1654 is to be used only when there is no extrinsic evidence available to aid in the interpretation of the contract or where the uncertainty cannot be remedied by other rules of interpretation. The rule does not stand for the proposition that, in every case where one of the parties to a contract points out a possible ambiguity, the interpretation favored by the non-drafting party will prevail. The rule remains that the trier of fact will consider any available extrinsic evidence to determine what the parties actually intended the words of their contract to mean. Only in those instances where the extrinsic evidence is either lacking or is insufficient to resolve what the parties intended the terms of the contract to mean will the rule that ambiguities are resolved against the drafter of the contract be applied.

*Steller v. Sears, Roebuck & Co.*, 189 Cal. App. 4th 175, 183–84 (2010) (cleaned up); *accord Adwalls Media, LLC v. Ad Walls, LLC*, No. CIV. 12-00614 SOM, 2015 WL 419659, at *7 (D. Haw. Jan. 30, 2015) (holding that "[c]onstruction against the drafter is a rule of construction that courts apply only as a last resort" after other considerations cannot resolve the parties' intent, and citing decisions from multiple jurisdictions so holding).

Viewing the record as a whole, a reasonable jury could conclude that both parties intended the "entered into" language of the Transaction SOW to denote the beginning of meaningful discussions that later led to a sale, which would encompass at least IAC's September 28, 2018 valuation guidance, if not earlier conduct.  Under such an interpretation, Magisto and IAC "entered into" a "Covered Transaction" within the tail period, and Advsr was entitled to its fee upon the closing of that transaction several months later.  Magisto's motion for summary judgment as to Advsr's claim for breach of the Transaction SOW is DENIED.

Magisto is also not entitled to summary judgment on Advsr's theory, in the alternative, that Magisto breached the contract by intentionally delaying a deal beyond the tail period.  Magisto has specifically not sought summary judgment to resolve whether the tail period ended September 30, 2018 or October 14, 2018, and the Court declines to resolve that issue sua sponte.  Magisto MSJ at 3 n.18.  Boiman told Deutsche Bank on October 2, 2018 that he believed he could get a term sheet

United States District Court
Northern District of California

United States District Court
Northern District of California

1  from IAC within days if he asked for one and that Magisto would be expected to sign within days.

2  Roizen Decl. Ex. 60.  Zilka testified that he would have liked to get an LOI as early as possible,

3  including in September.  Daniel Decl. Ex. 1 (Zilka Dep.) at 205:5–206:13.  If a jury accepted

4  Boiman's testimony the parties intended the "entered into" language to require agreement as to

5  key terms, it might conclude that Magisto could have met that standard before the (disputed)

6  October 14, 2018 cutoff date of the tail period and avoided doing so to ensure that it would not

7  need to pay Advsr's fee.  A jury could of course also reach other conclusions as to nearly all of the

8  factual components of that theory, but Magisto is not entitled to summary judgment

9  ### 2.  Breach of the Implied Covenant of Good Faith and Fair Dealing

10  "The covenant of good faith and fair dealing, implied by law in every contract, exists

11  merely to prevent one contracting party from unfairly frustrating the other party's right to receive

12  the benefits of the agreement actually made."  *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 349

13  (2000) (emphasis omitted).  Advsr alleges in its complaint that Magisto breached that duty by:

> (a) improperly failing to advise and obtain approval from the Board to pursue the Vimeo acquisition and actively working to delay such advice and approval; (b) actively concealing Advsr's work from the Board . . . ; (c) failing to notify Advsr of any purportedly required additional threshold for Advsr to obtain its fee; and (d) deliberately causing Advsr to believe that no such additional threshold existed (including, inter alia, by telling Advsr it would receive its fee after receipt of the September 28th Offer).

19  FAC ¶ 148.

20  Magisto asserts that there is no evidence it concealed the Vimeo deal or Advsr's work from

21  its board beyond Roizen's unfounded speculation and that such claims overlap entirely with its

22  contractual obligations, and does not address the other grounds for the claim asserted in Advsr's

23  complaint.  While Magisto cites no authority for the premise, it is correct that under California

24  law, a claim for breach of the implied covenant of good faith does not lie where it is redundant to a

25  claim for breach of contract.  *See ShopKo Stores Operating Co., LLC v. Balboa Cap. Corp.*, No.

26  8:16-cv-00099-JLS-KES, 2017 WL 3579879, at *9 (C.D. Cal. July 13, 2017) (citing *Careau &*

27  *Co. v. Sec. Pac. Bus. Credit, Inc.*, 272 Cal. Rptr. 387, 400 (Ct. App. 1990)).

28  The only benefit under the contract that Advsr could have obtained from Magisto revealing

1   the deal to the board would be payment of its fee if either: (1) the threshold of "entering into" a

2   covered transaction had been met and the board recognized it as such; or (2) bringing negotiations

3   to the board's attention sooner would have led to more concrete results within the tail period as

4   needed to meet that that threshold.  In the former scenario, the claim is redundant to Advsr's claim

5   that Magisto breached its contractual obligation to pay the fee.  In the latter, it is redundant to

6   Advsr's claim that Magisto breached the prohibition on intentionally delaying a deal.  Magisto's

7   motion for summary judgment is therefore GRANTED as to Advsr's implied covenant claim

8   based on failure to inform the board.

9        Magisto simply omits the other factual premises asserted in the complaint for this claim

10   from its motion.  *See* Magisto MSJ at 20.  At the very least, Roizen's September 28, 2018

11   conversation with Boiman could—if Roizen's description of it is credited, which it must be for the

12   purpose of Defendants' motions—be construed as Boiman assuring Roizen that Advsr had met the

13   conditions to earn its fee if a transaction with IAC was later consummated, and a jury could find

14   that Boiman actually believed Advsr had not met that condition.  *See* Roizen Decl. ¶ 110.  Such a

15   statement may have prevented Advsr from securing more concrete terms that might have satisfied

16   a higher threshold of "entering into" a transaction during the waning days of the tail period,

17   especially if it did not expire until October 14, 2018.  In the absence of argument or authority to

18   the contrary, the Court will allow Advsr's implied covenant claim to proceed on that theory, and

19   DENIES Magisto's motion in that respect.

20               **3.     Fraud**

21        Advsr bases its fraud claim on extra-contractual representations that it would be paid its fee

22   if a deal closed with IAC.  *See* Opp'n at 40 (citing Roizen Decl. ¶¶ 106–13).

> The elements of fraud are (1) misrepresentation; (2) knowledge of
> falsity; (3) intent to defraud; (4) justifiable reliance; and (5) resulting
> damage. *Lazar v. Super. Ct.*, 12 Cal. 4th 631, 638 (1996). "A promise
> to do something necessarily implies the intention to perform; hence,
> where a promise is made without such intention, there is an implied
> misrepresentation of fact that may be actionable fraud." *Id.*

27   *Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 960 (9th Cir. 2013).

28        To the extent this theory is based on Boiman's purported statement to Roizen after

United States District Court
Northern District of California

termination of the Transaction SOW in 2017 that Advsr would nevertheless be paid if a deal with IAC materialized, all evidence in the record indicates that statement referred only to meeting the contractual threshold of entering a covered transaction during the tail period, and that all parties understood it as such.  Roizen's August 2018 text messages to his colleague regarding the need to secure meaningful discussions with IAC before September 30, 2018, Roizen Decl. ¶ 21, are wholly inconsistent with the premise that Roizen believed at that time Advsr would be paid for a completed IAC deal regardless of whether it "entered into" that transaction during the tail period, and Advsr has provided no explanation to reconcile those test messages with its theory.[8]  On this record, no reasonable jury could find that Boiman made an intentionally false statement in 2017 that Advsr would be paid for an IAC transaction regardless of its timing, or that Roizen actually relied on such a statement.  The work that Advsr performed at least through mid-September of 2018 was wholly consistent with the hope that Magisto would "enter into" a transaction during the tail period.[9]  Magisto's motion for summary judgment is GRANTED as to that theory of fraud.

Magisto is also entitled to summary judgment to the extent Advsr bases its theory on Zilka's statement in October 2018 that Advsr had earned some compensation, because Advsr has identified no evidence of detrimental reliance after the date of that meeting.

Boiman's purported assurance after receiving IAC's September 28 2018 valuation range that Advsr would be paid its fee is a different story.  On Defendants' motions for summary judgment, the Court credits Roizen's declaration that Boiman assured him the fee would be paid if the deal closed, and disregards Boiman's testimony to the contrary that he had only discussed a possibility of gratuitous payment if approved by the board of directors.[10]  Based on Boiman's

---

[8] There is also some tension between this theory and Roizen's mid-September 2018 request to extend the tail period, but Roizen has explained that as referring only to possible deals with other potential buyers besides IAC.  Since the earlier text messages are sufficient to grant summary judgment, the Court need not decide whether a reasonable jury could credit Roizen's explanation of his request for an extension.

[9] Accordingly, no reasonable jury could find on this record that Magisto merely seeking or accepting assistance from Advsr during that time implied any modification to the tail period, nor that if Advsr relied on such perceived implications, such reliance was reasonable.  *See* Roizen Decl. ¶¶ 109, 112 (addressing such collaboration as purportedly implying that Advsr would be paid its fee regardless of the tail period).

[10] Even if Boiman's version of the conversation is correct, it is possible that could also support a claim since there is no evidence Boiman ever brought the matter to the board's attention, or that he

33

statements shortly thereafter that he did not believe Advsr was entitled to its fee, including to Deutsche Bank and Zilka, a jury could conclude that Boiman did not actually believe the assurance he purportedly provided to Roizen.  A jury might reasonably infer that Boiman intended Advsr to rely on his statement—perhaps to secure continued assistance until a new banker was retained, or as a backup option if no satisfactory deal could be reached with another banker, or to prevent Advsr from pushing for a more concrete step towards a deal in the final days of the tail period.  A jury could also conclude that Roizen relied on that assurance to his detriment by continuing to work on the deal, communicating with IAC, preparing a presentation for Magisto's board, and turning down other work in at least the early part of October.  Magisto's motion for summary judgment is DENIED to the extent Advsr's fraud claim is based on Boiman's conversation with Roizen at the end of September.

### 4. Breach of Implied Contract

Advsr asserts that it formed a new implied contract with Magisto in August 2018 when Boiman expressed his desire to "engage" Advsr in negotiations with IAC, and through the parties' conduct thereafter.  *See* FAC ¶ 135.

> As to the basic elements, there is no difference between an express and implied contract. While an express contract is defined as one, the terms of which are stated in words, an implied contract is an agreement, the existence and terms of which are manifested by conduct. Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings.

*Levy v. Only Cremations for Pets, Inc.*, 57 Cal. App. 5th 203, 211 (2020).

As to most of the conduct at issue, Magisto's motion for summary judgment on this claim is GRANTED for largely the same reasons as discussed above in limiting Advsr's fraud claim. The parties' conduct is largely consistent with efforts by Advsr to obtain its fee under the original terms of the Transaction SOW's tail period, not a new implied contract.  Even after Boiman "engaged" Advsr again in early August, Roizen expressed privately that discussions with IAC

---

actually intended to do so, and Roizen could have reasonably acted in reliance on an implied promise that Boiman would at least seek gratuitous compensation for Advsr from the board.

34

needed reach a threshold of seriousness (but not necessarily close) by September 30, 2018, plainly indicating his belief that the Transaction SOW controlled.  Roizen Decl. ¶ 21.  As the parties continued working together into September and that deadline approached, discussions with IAC also intensified.  There is no evidence to suggest that *both* parties had agreed at this time to extend Advsr's eligibility for its fee beyond the tail.

Once again, conduct after September 28, 2018 presents different considerations.  Boiman's purported assurance that there was "no question" Advsr would receive its fee if the deal was consummated, Roizen Decl. ¶ 104, viewed in concert with Advsr's ongoing work towards a deal, purportedly at Magisto's behest, *id.* ¶ 105, could imply a new agreement that, at that point, Advsr had done sufficient work that it would be entitled to its fee if the deal closed, even if the negotiations before September 30, 2018 had not risen to the level of entering into a covered transaction.  Courts may consider evidence of a separate oral contract "to create a new agreement at the termination of the written agreement."  *Girard v. Ball*, 125 Cal. App. 3d 772, 785 (1981).  The principle applies equally to implied contracts.

Magisto's motion for summary judgment on Advsr's implied contract claim is GRANTED to the extent that claim rests on conduct predating September 28, 2018, but DENIED to the extent it rests on conduct on or after that date.

### 5.   Quantum Meruit

> Quantum meruit refers to the well-established principle that the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered. To recover in quantum meruit, a party need not prove the existence of a contract but it must show the circumstances were such that the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made.

*Huskinson & Brown v. Wolf*, 32 Cal. 4th 453, 458 (2004) (cleaned up).  A "quantum meruit claim fails" where "the parties' Contract sets forth terms governing the subject matter for which Plaintiff now seeks equitable recovery."  *DPR Constr. v. Shire Regenerative Med., Inc.*, 204 F. Supp. 3d 1118, 1131 (S.D. Cal. 2016) (citing *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1404–05 (9th Cir. 1996)).

During the course of the tail period, the Court agrees with Magisto that the Transaction

35

SOW governed the parties' conduct. Although the parties had terminated that contract, both parties agree that obligations under its tail period were still effective, such that Magisto would have been obligated to pay Advsr if an acquisition deal had reached some threshold—the exact nature of which is in dispute—during that time. Holding that work done during that period in an effort to secure such a deal, and thus potentially entitlement to payment under the terms of the Transaction SOW, is alternatively subject to compensation under a quantum meruit theory even if the threshold is not met before the end of the tail would eviscerate the limitations of the contract. Advsr cite no authority permitting recovery through quantum meruit in such circumstances.[11]

As for work performed after the tail period ended, however, Advsr may be able to prevail on this claim. Roizen states in his declaration that "[a]t every step of the Transaction until September 30th (*and even into October*), Magisto asked Advsr to perform more services for it, Advsr performed those services, Magisto accepted those services, and then Magisto asked Advsr to perform yet additional services." Roizen Decl. ¶ 105 (emphasis added). While thin, that declaration provides at least some evidence of a course of dealing beyond one of the possible termination dates of the tail period. If a jury determines that the tail period ended September 30, 2018 and the transaction had not progressed to a point by that date that would entitle Advsr to its fee, the jury could conclude that tasks performed by Advsr at Magisto's request after that date was extra-contractual work for which both parties expected Advsr would be compensated. Zilka's statement to Roizen that he believed Advsr should receive some degree of compensation even if not entitled under the contract[12] lends some support to that conclusion.

Accordingly, Magisto's motion for summary judgment is GRANTED as to Advsr's quantum meruit claim to the extent it is based on work performed during the tail period of the Transaction SOW, but DENIED to the extent it is based on work performed after the tail ended.

---

[11] Several of the cases Advsr cites in its brief, including at least one case addressing quantum meruit, are unpublished California appellate decisions, citation of which is prohibited by the California courts and this Court's local rules. *See* Civ. L.R. 3-4(e); Cal. R. Ct. 8.1115(a). The Court disregards those citations. Based on Advsr's description of those cases, however, they would not alter this Court's conclusions even if they could properly be considered.

[12] The exact nature of this statement is disputed, but this is at least one reasonable interpretation of it. *See* Daniel Decl. Ex. 1 (Zilka Dep.) at 162:23–163:17.

### 6.     Promissory Estoppel

"The elements of a promissory estoppel claim are (1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) the reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." *Aceves v. U.S. Bank N.A.*, 192 Cal. App. 4th 218, 225 (2011) (cleaned up).

Magisto asserts that it is entitled to summary judgment on Advsr's claim for promissory estoppel because that doctrine "'exists to enforce promises that for some reason—typically failure of consideration—are not enforceable as contracts,'" while any obligation by Magisto to pay Advsr was based on the terms of the Transaction SOW, which might or might not have been satisfied, but in any event constitute a valid contract. *See* Magisto MSJ at 25 (citing *De Zemplen v. Home Fed. Sav. & Loan Ass'n*, 221 Cal. App. 2d 197, 207 (Ct. App. 1963)). Advsr argues that it can proceed on this claim because the Transaction SOW had been terminated before most of the work at issue.

As discussed above in the context of fraud and quantum meruit, the Court is not persuaded that the Transaction SOW's termination negates its effect on work performed during the tail period, or that Advsr did or could reasonably rely on any implication during that time that it would receive compensation regardless of the tail period's limitations. The only exception is Boiman's purported assurance on September 28, 2018 that Advsr would be receive its fee if the deal was eventually consummated.[13] As described by Roizen, that was a clear and unambiguous promise, and a jury could find the remaining elements of this claim satisfied as to that statement for the same reasons discussed above in the context of the fraud claim.

Magisto's motion is DENIED to the extent Advsr's promissory estoppel claim rests on Roizen's September 28, 2018 assurance, but otherwise GRANTED as to this claim.

### 7.     Unjust Enrichment

The parties disagree as to whether unjust enrichment is itself a claim under California law.

---

[13] While promissory estoppel is not limited to the circumstances cited by Magisto of near-contracts that fail for lack of consideration, this promise could fit into that framework, as it is not clear whether Advsr offered any consideration in exchange for the assurance.

1    Courts disagree as well.

2         The Ninth Circuit held in a 2015 decision that no such claim existed, but that courts could

3    "'construe the cause of action as a quasi-contract claim seeking restitution.'"  *Astiana v. Hain*

4    *Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (quoting *Rutherford Holdings, LLC v.*

5    *Plaza Del Rey*, 223 Cal. App. 4th 221 (2014)).  Subsequent unpublished decisions by the Ninth

6    Circuit[14] have differed as to whether that remains true, or whether a later 2015 decision by the

7    California Supreme Court recognized such a claim.  *Compare Baiul-Farina v. Lemire*, 804 F.

8    App'x 533, 537 (9th Cir. 2020) ("The complaint alleged an unjust enrichment claim against

9    Ukraine, but '[u]njust enrichment is not a cause of action' under California law." (quoting

10   *McBride v. Boughton*, 123 Cal. App. 4th 379, 387 (2004)), *with Bruton v. Gerber Prod. Co.*, 703

11   F. App'x 468, 470 (9th Cir. 2017) ("But since [the district court decision at issue], the California

12   Supreme Court has clarified California law, allowing an independent claim for unjust enrichment

13   to proceed in an insurance dispute." (citing *Hartford Cas. Ins. Co. v. J.R. Mktg., LLC*, 61 Cal. 4th

14   988, 1000 (2015))).

15        The parties do not address that conflicting case law in detail or the precise contours of a

16   claim for either unjust enrichment or quasi-contract beyond the other equitable claims addressed

17   above.  *See* Magisto MSJ at 24–25; Opp'n at 43.  Magisto contends that a quasi-contract claim (as

18   it contends this should be construed) cannot lie where an actual contract governs the parties'

19   relationship, Magisto MSJ at 24–25, while Advsr argues that "the unjust enrichment claim should

20   be sustained (under whatever label) under the established facts so as to preserve Advsr's prayer for

21   restitutionary relief," Opp'n at 43.

22        Advsr does not contend that its unjust enrichment claims is any broader than its quantum

23   meruit or promissory estoppel claims except as to the potential remedy.  The Court has allowed

24   those claims to proceed based on conduct that falls outside the parties' express contractual

25   relationship.  Magisto's motion for summary judgment on the unjust enrichment claim is

26   GRANTED except as to the conduct discussed above in the context of quantum meruit and

27   ───────────────

28   [14] Unlike unpublished California appellate decisions, unpublished Ninth Circuit decisions issued
     on or after January 1, 2007 may be cited for their persuasive value.  *See* 9th Cir. Rule 36-3(b).

*United States District Court*
*Northern District of California*

1    promissory estoppel, without prejudice to any further argument in pre- or post-trial briefing as to

2    whether this claim is viable and serves any purpose beyond Advsr's other surviving claims.

3        **C.    Claims Against Zilka**

4        Advsr asserts claims for interference with contract and with prospective economic relations

5    against Zilka, based on his purported 2018 and 2019 involvement in denying Advsr its fee and

6    concealing its work from the board of directors.  FAC ¶¶ 189, 196.  Advsr does not rely on Zilka's

7    role in the 2017 decision to terminate the Transaction SOW for this claim, *see id.*, although it cites

8    that history as demonstrating that Zilka's low regard for Advsr and motive to interfere, Opp'n at

9    45–46.

10       "The elements which a plaintiff must plead to state the cause of action for intentional

11   interference with contractual relations are (1) a valid contract between plaintiff and a third party;

12   (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a

13   breach or disruption of the contractual relationship; (4) actual breach or disruption of the

14   contractual relationship; and (5) resulting damage."  *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,

15   50 Cal. 3d 1118, 1126 (1990).  "[W]hile the tort of inducing breach of contract requires proof of a

16   breach, the cause of action for interference with contractual relations is distinct and requires only

17   proof of interference."  *Id.* at 1129.

18       A claim for intentional interference with prospective economic relations is similar to

19   intentional interference with contract.  "A plaintiff asserting this tort must show that the defendant

20   knowingly interfered with an 'economic relationship between the plaintiff and some third party,

21   [which carries] the probability of future economic benefit to the plaintiff.'"  *Ixchel Pharma, LLC*

22   *v. Biogen, Inc.*, 9 Cal. 5th 1130, 1141 (2020) (quoting *Korea Supply Co. v. Lockheed Martin*

23   *Corp.*, 29 Cal. 4th 1134, 1153 (2003)) (alteration in original).  "Although this need not be a

24   contractual relationship, an existing relationship is required."  *Roth v. Rhodes*, 25 Cal. App. 4th

25   530, 546 (1994).  The plaintiff "must plead as an element of the claim that the defendant's conduct

26   was 'wrongful by some legal measure other than the fact of interference itself.'"  *Id.* at 1142

27   (quoting *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995)).

28       As a defense to claims of intentional interference, California recognizes a "manager's

1    privilege," under which "'a manager or agent may, with impersonal or disinterested motive,

2    properly endeavor to protect the interests of his principal by counseling the breach of a contract

3    with a third party which he reasonably believes to be harmful to his employer's best interests.'"

4    *Huynh v. Vu*, 111 Cal. App. 4th 1183, 1195 (2003) (quoting *Olivet v. Frischling*, 104 Cal. App. 3d

5    831, 840–41 (1980), *disapproved on other grounds by Applied Equip. Corp. v. Litton Saudi*

6    *Arabia Ltd.*, 7 Cal. 4th 503, 510 (1994)).  The scope of this privilege "is neither clear nor

7    consistent," and can take "'three formulations . . . : (1) absolute, (2) mixed motive, and

8    (3) predominant motive.'"  *Id.* (quoting *Halvorsen v. Aramark Unif. Servs., Inc.*, 65 Cal. App. 4th

9    1383, 1391 (1998)).

10        This Court previously followed *Huynh*'s endorsement of the "predominant motive" test,

11    and stands by that conclusion here.  Order re Mot. to Dismiss at 14.  Under that test, if "a manager

12    stood to reap a tangible personal benefit from the principal's breach of contract, so that it is at least

13    reasonably possible that the manager acted out of self-interest rather than in the interest of the

14    principal, the manager should not enjoy the protection of the manager's privilege unless the trier

15    of fact concludes that the manager's *predominant* motive was to benefit the principal."  *Huynh*,

16    111 Cal. App. 4th at 1198.

17        Advsr does not dispute that Zilka's statement about Advsr's poor performance in 2017

18    during the board's consideration of whether to terminate the Transaction SOW are covered by the

19    manager's privilege.  In that context, Zilka plainly believed Advsr was not serving Magisto well

20    and that its continued retention was not in Magisto's best interest—precisely the sort of decision

21    protected by the manager's privilege.

22        To get around the privilege with respect to the purported conduct at issue in 2018 and

23    2019, Advsr contends that Zilka was focused on his own personal interest in securing a cash (as

24    opposed to stock) deal due to the nature of his investment, rather than Magisto's interest in

25    securing the best possible compensation.  Opp'n at 48–49.  There is certainly some evidence that

26    Zilka preferred a cash deal, and that Zilka and Boiman were not as forthcoming with the board

27    about Advsr's involvement as they might have been, such that chairman Doron Birger and other

28    board members only knew that Advsr was pursuing compensation and had any role in the deal

United States District Court
Northern District of California

40

United States District Court
Northern District of California

1    after it was complete.  But the connection between on one hand, Zilka's preference for cash over

2    stock, and on the other hand, the decision not to pay Advsr its fee or retain it to conclude the deal,

3    is wholly speculative.

4         Boiman's testimony that Zilka did not think Advsr was a capable partner or as good as

5    more established investment banks stands unrebutted, and is entirely consistent with Zilka's

6    comments in 2017.  Advsr notes that Zilka "disliked Advsr" and "was a driving force in Advsr's

7    termination" as evidence that he likely played a role in denying Advsr its fee, but neglects that

8    Zilka's "dislike[]" of Advsr and role in its termination were indisputably based on his perception

9    of Advsr's performance, and thus aligned with Magisto's interest.  There is no evidence that Advsr

10   had pushed for a stock deal or that Zilka believed it was likely to do so.  While Zilka suggested

11   that a draft LOI should omit the date of the September nondisclosure agreement negotiated with

12   Advsr's assistance—a statement that is strangely not addressed at all in deposition testimony

13   submitted by either side—there is no evidence that his desire to avoid that date related to his

14   personal interest in a cash deal,[15] rather than Magisto's interest in avoiding paying a fee.

15        At the hearing, Advsr asserted for the first time that Zilka cannot claim the manager's

16   privilege because he was not a "manager" of Magisto.  Advsr waived that argument by failing to

17   include it in its briefing, where it instead argued only that there is evidence Zilka was primarily

18   motivated by self-interest.  Opp'n at 48–49; *see Hong Liu v. Faraday & Future Inc.*, No. CV

19   20-8035-SVW (JPRx), 2021 WL 3264417, at *3 (C.D. Cal. May 3, 2021) (declining to consider

20   an argument first raised at a hearing).  Regardless, the privilege applies not only to "managers,"

21   but also to "agents."  *Huynh*, 111 Cal. App. 4th at 1194–95.  The *Huynh* court applied the

22   privilege to a husband acting as his wife's agent in the context of a property sale.  *See id.*  Advsr

23   acknowledges that "[t]hough Zilka was not a manager, he drove management decisions regarding

24

---

25   [15] It is also not clear that Magisto's desire for cash compensation actually stemmed from Zilka's
     personal motivations rather than genuine interests of the company.  A Deutsche Bank presentation

26   from early October 2018 notes concerns about the lack of liquidity of Vimeo's private stock and
     uncertainty as to when an IPO might occur that would allow such stock to be more easily sold.

27   While Advsr is likely correct that, in hindsight based on an IPO and significant increase in
     valuation occurring well after the events at issue, Vimeo stock would have been more valuable to

28   Magisto than the equivalent amount in cash, that does not negate Magisto's potentially legitimate
     interest in avoiding uncertainty and obtaining liquid compensation at the time of the sale.

the Transaction." Opp'n at 14.[16]  There is no dispute that Zilka worked on the transaction in conjunction with and at the behest of Boiman, Magisto's CEO.  The Court is satisfied that Zilka acted as either an agent or manager of Magisto and therefore falls within the scope of the privilege.

"Arguments based on conjecture or speculation are insufficient to raise a genuine issue of material fact" to preclude summary judgment.  *R.W. Beck & Assocs. v. City & Borough of Sitka*, 27 F.3d 1475, 1481 n.4 (9th Cir. 1994); *see McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1173 (9th Cir. 2016).  Advsr has now had a full opportunity to develop a factual record, and has produced no evidence that Zilka's personal preference for receiving cash rather than stock from IAC influenced the decisions to refuse Advsr its fee and decline to retain Advsr to complete the deal.  The manager's privilege therefore applies to whatever role Zilka may have had in those decisions, and Zilka's motion for summary judgment is GRANTED as to both claims against him. The Court does not reach the parties' remaining arguments as to the merits of those claims.

## IV. CONCLUSION

For the reasons discussed above, Magisto's motion for summary judgment is GRANTED in part and DENIED in part.  All of Advsr's claims against Magisto may proceed, although some are limited to certain conduct.  Zilka's motion for summary judgment is GRANTED as to both claims asserted against him.

**IT IS SO ORDERED.**

Dated: August 13, 2021

_____
JOSEPH C. SPERO
Chief Magistrate Judge

---

[16] This sentence appears in Advsr's summary of the facts of the case.  It is not an argument that Zilka was ineligible to claim the privilege by virtue of his role as a director.

United States District Court
Northern District of California